GRANEY et ux. v. ST. LOUIS, IRON MOUNTAIN AND SOUTHERN RAILWAY COMPANY, Appellant.

In Banc, June 30, 1900.

1. **Appeals:** REVERSAL ONLY FOR ERRORS OF LAW OR FAILURE OF EVIDENCE. On appeal from an order granting plaintiff's motion for a new trial, the Supreme Court will not interfere except for errors of law, or where there is no basis in the evidence on which a verdict for plaintiff should be permitted to stand.

2. **Negligence:** SPEED OF TRAIN: INSTRUCTION. In an action to recover for injuries to a boy by a train, claimed to have been caused by the unlawful rate of speed at which it was running, it is not error to instruct that the boy had no right to presume that the train was running at less than the rate limited by ordinance, when, by looking, he could see that it was moving faster, and it is shown that the boy was a bright boy, and familiar with the movements and speed of trains at the place where the injury occurred.

3. **Evidence:** EFFECT OF MOVING TRAIN ON PERSON NEAR TRACK. A professor of physics testified that he had traveled extensively, and during such traveling had observed the effect of a moving train on the air around it; that a train of twenty to twenty-three freight cars and engine, running at a speed of twenty to twenty-five miles an hour, would create such a current of air as might be sufficient to throw down a boy weighing sixty-five pounds, standing within two or three feet of the train; and that there would be a further tendency to throw a boy weighing sixty-five pounds, standing within two or three feet of the train; and that there would be a further tendency to turn him around as he fell, which would be sufficient to make him roll when he struck the ground. *Held*, in the absence of testimony that the witness had ever read in any scientific or other work the results of experiments of others as to the effect of passing trains on any live animal capable of offering resistance to the current of air created by a swiftly-moving train, or had himself made such experiments, that his testimony is incompetent.

4. ———: ———: SUCTION OF AIR UNDER TRAIN: OPINION EVIDENCE. In an action against a railroad to recover for injuries to a boy, where the plaintiff claims that the boy was sucked under the train by the current of air created by its running at a speed prohibited by ordinance, and the defendant claimed and introduced evidence

tending to prove that the boy was standing so near to the cars that he was struck by some projection thereof, testimony of an expert as to whether or not it would have been possible for the boy to have fallen in the manner in which witnesses have testified that he did fall, without the train striking him, is incompetent, since such question was for the jury, and not a proper subject for opinion evidence.

5. **Suction of Boy Under Train**: KNOWLEDGE OF RESULT: LIABILITY OF RAILROAD. In an action against a railroad to recover for injuries to a boy, where the plaintiff claims he was sucked under the train by the current of air put in motion by the train while running at a rate of speed prohibited by ordinance, the defendant can not be held liable where it is not shown that he knew that such excessive speed would have produced such a result, or that a reasonably prudent man would have apprehended it.

6. ——: NON-PROBATIVE EVIDENCE. The allegations of a complaint in an action to recover for injuries to a boy alleged to have been caused by the boy's being "sucked into and under said train by the · force and velocity of said train, which speed and velocity formed a vacuum into which he fell, and was sucked under the wheels of the cars," is not supported by testimony that the wind turned him around, and made him fall, and he rolled under the cars. BRACE, J., dissenting.

Appeal from St. Louis County Circuit Court.—*Hon. Rudolph Hirzel,* Judge.

REVERSED AND REMANDED (*with directions*).

*Martin L. Clardy and Henry G. Herbel* for appellant.

(1) Under the facts of this case, instruction numbered 1 was a correct statement of the law, and the court, therefore, erred in sustaining the motion for a new trial on the ground that it was not. The deceased, with his comrades, was at the crossing before the train. His comrades testified that they saw the train approaching, and they all said that it was running very rapidly. It is fair to assume that deceased saw the train and that he also knew that it was

moving at a rapid rate of speed.    Graney et ux. v. Railroad, 140 Mo. 100.    He was nearly twelve years old; he had been reared near the railroad tracks; he was familiar with the running of trains on the Iron Mountain road; indeed, he was in the habit of "hopping" on moving trains, and excelled all his associates in that practice.    Spillane v. Railroad, 135 Mo. 414.    Like every one else, a child must exercise such care as may reasonably be expected of its age and condition, and whether it has done so in a given case is sometimes a question for the jury.    His age and intelligence, however, may be such that the court will hold, as a matter of law, that his action in contributing to his own injury precludes a recovery. Shearman & Redfield on Negligence, sec. 73; Nagle v. Railroad, 88 Pa. St. 35; Elliott on Railroads, sec. 1261; Powers v. Railroad, 59 N. W. Rep. 307; Tucker v. Railroad, 26 N. E. Rep. 916.    (2) Instruction numbered 6 announces an admittedly correct principle of law, if it be true that the "man of ordinary prudence and circumspection" referred to in it is the person in charge of the train.    Hoag v. Railroad, 85 Pa. St. 293; Railway Accident Law (Patterson), sec. 14. (3) The verdict is clearly right on the evidence, and errors, if any, in the instructions will be treated as harmless.    Section 2303, R. S. 1889; McGrew v. Railroad, 109 Mo. 589; Bradford v. Floyd, 80 Mo. 207; Noble v. Blount, 77 Mo. 235; Frick v. Railroad, 75 Mo. 595; Sparling v. Conway, 75 Mo. 510; Nelson v. Foster, 66 Mo. 381; Gray v. Railroad, 64 Mo. 47; Dunbar v. Wightman, 51 Mo. 432; Hedecker v. Ganzhorn, 50 Mo. 154; Tate v. Barcroft, 1 Mo. 163; Beiler v. Divoll, 40 Mo. App. 251; Cheek v. Waldron, 39 Mo. App. 21.    (4) The defendant, on this appeal, has a right to insist that, under the pleadings and the evidence, there was no case for the jury, and if this point be established, the action of the court in awarding a new trial must be reversed.    Payne v. Railroad, 136 Mo. 562; Spillane v. Railroad, 135 Mo.

414; Ridenhour v. Railroad, 102 Mo. 270.    It has been held that a boy between eleven and twelve years of age will be presumed to know the danger he incurs in going upon a railroad track immediately in front of a running train. Masser v. Railroad, 68 Ia. 602; Tucker v. Railroad, 124 N. Y. 308.    While the record in the former case gave the court "No information in respect to his intelligence, knowledge of running trains or physical activity," the record of the case now is replete with facts which attest the character and intelligence of the deceased, his familiarity with the running of trains, and his "physical activity" in hopping upon trains. Maxey v. Railroad, 113 Mo. 1; Bond v. Railroad, 105 Mo. 371; Williams v. Railroad, 93 Mo. 279; Yancey v. Railroad, 93 Mo. 433; Kelly v. Railroad, 80 Mo. 547; Hixson v. Railroad, 80 Mo. 340.    The persons for whose death the railroad companies are made liable are those on the track and those crossing the track who are struck by the train, and not persons who stand alongside the track, awaiting the passage of trains.    Bell v. Railroad, 72 Mo. 50; Hodges v. Railroad, 71 Mo. 50; Bower v. Railroad, 69 Mo. 219; Johnson v. Railroad, 13 A. & E. R. R. Cas. 623; Railroad v. Feathers (Tenn.) 15 A. & E. R. R. Cas. 446; Railway Accident Law (Patterson), sec. 160.    (5) The contributory negligence of the deceased ought to defeat plaintiffs' recovery. Yarnell v. Railroad, 75 Mo. 583; Guenther v. Railroad, 108 Mo. 18; Prewitt v. Eddy, 115 Mo. 283; Dlauhi v. Railroad, 105 Mo. 645; Ridenhour v. Railroad, 102 Mo. 270; Payne v. Railroad, 129 Mo. 421; Spillane v. Railroad, 135 Mo. 414. (6) The court is not bound to adopt plaintiff's theory of the cause of the accident, but will take judicial notice of the scientific facts involved to determine whether the theory advanced can be sustained.    Nugent v. Milling Co., 131 Mo. 253; King v. Gallan, 109 U. S. 99; Terhune v. Phillips, 99 U. S. 592; St. Louis Gas Light Co. v. Ins. Co., 33 Mo. App.

348; Underhill on Evidence, p. 371; 1 Greenleaf on Evidence (15 Ed.), sec. 5; Garth v. Caldwell, 76 Mo. 622.

*William B. Thompson* and *Ford W. Thompson* for respondents.

(1) The appellant, from an order directing a new trial, is required to show error as to the grounds thereof set out in the record of the trial court, whereupon respondent may show that, notwithstanding the reasons given and entered upon the record, the new trial should have been ordered on other grounds set out and complained of in his motion for a new trial. Miller v. Madison Car Co., 130 Mo. 517; Candee v. Railroad, 130 Mo. 153; Bradley v. Repell, 133 Mo. 545; Ittner v. Hughes, 133 Mo. 619. (2) When the trial court has exercised its discretion in favor of respondent and directed a new trial, the propriety of its action is conclusive, and this court will not interfere, unless it can be shown that such action is arbitrary, and manifestly and clearly wrong, and the presumption in favor of the trial court's action is perhaps stronger where it has granted a new trial than where it has refused one, because it is better able to judge of the weight and effect of the error which it has committed, having heard the argument of counsel based upon it, and observed its probable effect upon the jury. Ensor v. Smith, 57 Mo. App. 584; Huckshold v. Railroad, 90 Mo. 548; Bank v. Armstrong, 92 Mo. 265; Langdon v. Kelley, 51 Mo. App. 572; Shepherd v. Brenton, 15 Iowa, 91. (3) The reasons given by the trial court were based upon the errors contained in defendant's instructions 1 and 6. These instructions contain very erroneous statements of the law, which could not have failed to influence the jury in determining their verdict. (a) The error contained in instruction No. 1 consists in stating to the jury that the law did not permit the boy to presume that the train was running at the legal rate of six miles per

hour, but made it his duty to look and discover whether or not it was obeying the law; the law does permit such a presumption to be indulged, and places no such duty upon plaintiff.   O'Connor v. Railroad, 94 Mo. 150; Eswin v. Railroad, 96 Mo. 296; Schlereth v. Railroad, 96 Mo. 509; Kellny v. Railroad, 101 Mo. 67; Kenny v. Railroad, 105 Mo. 270; Crumpley v. Railroad, 111 Mo. 152; Jennings v. Railroad, 112 Mo. 268; Lynch v. Railroad, 112 Mo. 420; Sullivan v. Railroad, 117 Mo. 214; Weller v. Railroad, 120 Mo. 635. (b) The error complained of in defendant's instruction 6 consists in not only directing the jury that plaintiffs could not recover even though defendant's negligence directly occasioned the injury, as set out in the petition, if defendant could not reasonably have expected such a result to follow its unlawful action, but also in permitting the jury to consider the probability of such a result, since the very fact that defendant was liable if its negligence directly occasioned the injury was decided by this court upon the former appeal, hence *res adjudicata.*   Granley v. Railroad, 140 Mo. 89; Chapman v. Railroad, 146 Mo. 481.   That defendant is liable for all injury which directly results from its negligence, is a proposition of elementary law.

SHERWOOD, J.—This case has been here before (140 Mo. 89), and is known among the members of the bar of this State, as the "suction case."   It is an action for $5,000 damages for the death of James Graney, the minor son of plaintiffs, alleged to have been caused by his being "drawn or sucked into and under defendant's train by the force and velocity of said train which was moving at a reckless rate of speed," etc.

The petition charges that, on the eighteenth day of January, 1891, there were in force three valid ordinances in the city of St. Louis:   One prohibiting any car or cars, or

locomotive propelled by steam power, to be run at a rate of speed exceeding six miles per hour; another, requiring such locomotive to ring a bell constantly while running in the city limits; and the third, imposing a penalty for violation of either of the other two; and it also alleges the circumstances under which the son of plaintiffs was killed, to be as follows:

"On the eighteenth day of January, 1891, while said plaintiffs' minor son, James Graney, was standing in and upon the crossing of said Dorcas street, alongside of the track of the said railway operated by the said defendant, and at a sufficient and proper distance away from the said track, and away from the locomotive and cars operated by the said defendant and while exercising due and proper care, and relying upon the duty of the said defendant to operate its locomotive and cars according to said ordinances, at a rate of speed not in excess of the rate provided for in the said ordinances, he was by reason of the reckless and dangerous speed of the locomotive and train of cars operated by the said defendant, its agents and servants, suddenly and without any warning given to him by the ringing of the bell of the said locomotive or by the operation of the said cars, in accordance with the ordinances, drawn or sucked into and under said train by the force and velocity of said train which was moving at a reckless rate of speed and in violation of the said ordinances of said city, to-wit, at a rate of speed of twenty miles per hour, which speed and velocity caused a vacuum to form, into which the said James Graney fell and was sucked under the wheels of the cars attached to the locomotive and train of the said defendant, and the cars passed over the body of the said James Graney, so that he was injured, wounded and bruised, and suffered great pain and anguish, and then and there sustained mortal injuries and, as the result of the said injuries so received by him, on the nineteenth day of January, 1891, died from the result of said injuries."

Answer, a general denial and a plea of contributory negligence, alleging that the injury to and death of plaintiff's minor son "were caused by his own negligence and unlawful conduct in loitering about defendant's tracks while the trains of defendant were moving thereon, and placing himself in such close proximity to such moving trains as to be struck thereby, and in meddling and tampering with the cars composing defendant's train, while they were in motion, and in attempting to climb upon them, in violation of the statutes of the State of Missouri, viz., section 3927, Revised Statutes 1889, and of the ordinances of the city of St. Louis, to-wit, ordinance No. 13414."

On the trial the ordinances were read in evidence.

It is admitted that James Graney was killed on January 18, 1891, by being run over by a train of freight cars operated by defendant, and that he was the minor son of plaintiffs.

It is also admitted that, on the date mentioned, defendant controlled and operated a railroad, a portion of which is located in the city of St. Louis. It had two tracks, running north and south, which crossed Dorcas street at right angles. This street runs east and west.

On Sunday afternoon, January 18, 1891, James Graney, then eleven years and nine months old, and four other boys, to-wit, Peter Graney, Jr., Philip Breitweiser, John Ehret and Pat Harvey, went down Dorcas street from the west, intending to cross the railroad track and go down within half a block of the Mississippi river to a trestle used for the track from the Anheuser-Busch brewery, where hops were deposited after being used. When close to the crossing, a freight train of twenty-three cars, drawn by an engine, came to the crossing from the south on the east track, at the rate, it is said, of twenty miles an hour. James Graney stood between the two tracks, two or three feet from the west rail of the east track on which the train was passing. When about one-half or

two-thirds of the train had passed, witnesses testify that he whirled around and fell upon the ground, and that his legs got upon the rails and the cars passed over them, from the effects of which injury he died the next day.

The boy is said to have weighed sixty-three pounds, but there is not a particle of evidence on this subject, except an estimate of his weight by his mother, and by the undertaker. It was also in evidence that the boy lived but a little way from the railroad tracks, and was quite expert in, and in the habit of, hopping on and off the passing trains, and was a bright, active intelligent boy.

The testimony of the two experts will now in brief be stated:

Prof. Francis E. Nipher, a professor of physics in Washington University for over twenty-three years, after testifying to these facts, was questioned and gave the following answers:

"Q. In that department of science you have been in the habit of observing the movement of bodies through the air? A. Yes, sir.

"Q. State what has been your experience in observing the motion of railway trains through the air, and what experiments have you made in that direction? A. I have traveled about ten thousand miles, I presume, and during that time, have made experiments on the effect of the train on the air around it.

"Q. Is there any well-known law of science by which it is known that a body, such as a railroad train, affects the air as it passes through it? A. Yes, sir; there is. When the body moves through the air it drags the air along with it, and usually the air moves somewhat less rapidly than the body; the same is true of any other liquid.

"Q. Could you illustrate that by the revolving of any instrument? A. I have examined it by instrumental means and experimenting, both from the ground as the train passed,

and also experimenting from the train. Experimenting from the ground as the train passes, only makes it possible for the experiment to last during a very few minutes, while the train is passing. The best information is gotten by experimenting from the inside of the train, as then the experiment can last as long as you please. If you measure the pressure due to the wind, by means of an experiment from the train window, the wind pressure is less near the train, and as you project the instrument further out, the wind pressure increases, and when you get the instrument reached out into the undisturbed air, or less disturbed, the wind pressure there corresponds to the motion of the train; it gives the same pressure as a wind of the train-speed would give, or nearly that; but the air nearest to the train is moving to a large extent with it, measuring from the train, that wind pressure is much less and that is the air which would give the greatest pressure if you were standing on the ground near the train, because that air is moving with the train.

"Q. What would you say with reference to an engine with twenty or twenty-three freight cars, as to the pressure of the air? A. Such a train carries along a great deal of air with it, and any one can observe this fact by standing near enough to it.

"Q. Suppose it was running at the rate of twenty miles an hour, what would you say? A. If the conditions were right, there would be a very appreciable effect. A person standing near the train would receive a blow from this air moving with the train, and that blow might be sufficient to topple him over and cause him to lose his footing.

"Q. Now, suppose a small boy, weighing about sixty-three to sixty-five pounds standing near a train running twenty-five miles an hour, what would you say would be the effect of the velocity of the air created by the train on that boy? A. That might have the effect of throwing him over,

and there would be a further tendency to turn him around slightly—a tendency that would be sufficient to make him roll when he struck the ground.

"Q. Would that occur if the train was running at six miles an hour? A. No, sir; it would not.

"Q. You have heard the testimony in this case of these young men, and of Mrs. Vogel, in reference to the accident, did you not? A. I did.

"Q. You heard the testimony in this case of the young men and of Mrs. Vogel, in regard to the manner in which the boy fell; I will ask you if such a fall as that were possible without the boy striking the train or the train striking the boy? A. Yes, sir; I think it would be."

Defendant saved exception to this last question and answer.

Prof. Calvin M. Woodward testified: "That he was professor of mathematics and mechanics in the Washington University, and director of the manual training school; had been teaching mechanics for thirty years in the university; had studied all the problems connected with motion and force, both force produced by motion, and motion produced by force, and had made a great many general experiments. The actions of forces of air are perfectly well understood by scientific men, the moving air always produces a pressure upon the surface of bodies that are at rest; the extent varies according to the velocity of the current of air. In the case of wind produced by a train of cars, the velocity of such wind is greatest near the car and diminishes sideways; so that at a distance of several feet from the train the velocity of the wind produced by that train would be considerably less than at or near the train. A train of twenty cars running at the rate of twenty miles an hour, would produce a very strong wind along the sides of the train; it would produce a steady current along the sides, more than a very short one would. If a small boy, weighing from sixty-three

to sixty-five pounds, was standing near a train running at twenty to twenty-five miles an hour, the effect of the air created by the velocity of the train would be to produce a strong pressure upon the body of the boy, that would tend to tip him over and somewhat to turn him; whether it would throw him down or not, would depend upon the position of his feet; if his feet were close together, he would be in a very unstable position, and would easily lose his balance and be thrown down.   He did not think it possible that any body could be blown over by a train going six miles an hour.   He stated he had heard the testimony of the witnesses to the accident, and thought it was entirely possible that the boy fell in that manner without striking the train or the train striking the boy."

It is not asserted by plaintiffs that deceased was struck by the cars.   On the contrary, it is averred that he was not struck, but it is insisted that he was thrown to the ground and drawn under the cars by the force of the current of air caused by the speed at which the train was moving.

At the close of all the evidence, defendant's counsel asked the court to give an instruction in the nature of a demurrer to the evidence which was refused.

The results of the trial were a verdict for defendant, and a motion for a new trial by plaintiffs, which motion was granted, and defendant appeals.

The trial court, as required by section 801, Revised Statutes 1899, specified of record the grounds on which the new trial was granted.   They were:   The giving of the first and sixth instructions, at the instance of defendant, which are as follows:

"1.   The jury are instructed that the deceased, James Graney, had no right to presume that the train was running at less speed than six miles per hour, when, by looking, he could see that it was moving faster.

"6. The jury are also instructed that, although they may believe from the evidence that the speed of the train was as great as twenty miles an hour, and that such rate of speed was in excess of the rate of speed permitted by the ordinance of the city of St. Louis, and, although, as a result of such excessive rate of speed, the minor son of the plaintiffs, standing at a reasonable distance and out of danger from the train, ordinarily, was drawn in by the suction of the train, and in consequence was injured so as to cause his death; yet, if such result was not one which a man of ordinary prudence and circumspection could reasonably anticipate as likely to occur from such a rate of speed, then plaintiffs are not entitled to recover in this case, and the verdict should be for the defendant."

1. The section of the statute already referred to, first made its appearance in its present shape in the laws of 1887, p. 230. [See R. S. 1889, sec. 2241.] Section 2246, Laws 1895, p. 91 (now section 806, R. S. 1899) is in *pari materia* with section 801 aforesaid, and they are to be construed together. The only effect, and the only intended effect of the statutes of the laws of 1891 and 1895 in allowing appeals from judgments less than final, is precisely the same as it was when an appeal lay alone from a final judgment. In such circumstances, just as formerly under the old practice, the only grounds on which this court will interfere are for errors (that is judicial errors) or. where there is no basis in the evidence on which a verdict for the plaintiff should be permitted to stand, or where the verdict is plainly the result of passion or prejudice, etc.

This subject is elaborately discussed by MARSHALL, J., in Haven v. Railroad, 155 Mo. 216, and the conflicting decisions of this court on the point contrasted.

2. Looking then to the instructions under review, I do not find any error committed in the first one, because it is in

Graney v. St. L., I. M. & S. Ry. Co.

evidence that James Graney was thoroughly conversant with the running of trains. His comrades who were there present with him before the train arrived at the crossing, when the train was seen approaching, all say that it was running very rapidly. He was in a position to see the train, and it will be presumed in view of the surrounding facts as testified to by the witnesses present, that he did see the train. If he did, then his age, nearly twelve years, his brightness and intelligence, his familiarity with the operation of trains and the dangers incident thereto, must, under the decisions of this court, place him on the same plane as if *sui juris*. [Spillane v. Railroad, 135 Mo. 414; Payne v. Railroad, 136 Mo. 562, and cases cited. See also, Nagle v. Railroad, 88 Pa. St. 35; Hoag v. Railroad, 85 Pa. St. 293; 3 Elliott on Railroads, sec. 1261, pp. 1979-80.]

Possessing the knowledge that the boy did, and standing, as some of the witnesses state he did, within one or two feet of the track, he could not help seeing the train approaching, had he looked, and he must have known, just as his comrades did, that the train was running at a greater rate of speed than the ordinary rate, to-wit, six miles an hour, and knowing this, he (in the language of the objected-to instruction) "had no right to presume that the train was running at less speed than six miles an hour, when by looking, he could see that it was running faster."

3. The sixth instruction announces a principle often to be met with in the authorities, and occasionally announced by this court, to-wit, that if an injury occurs from a cause which no man of ordinary prudence could reasonably anticipate, unless in exceptional circumstances, would have happened; that such instances are assigned to the domain of inevitable accident, concerning which, no one being negligent, no one is responsible.

4. But in the view I take of the testimony in this case,

it is wholly immaterial whether the instructions were right or wrong, since in no event ought a verdict for plaintiffs to be allowed to stand, nor a verdict for defendant be allowed to fall.    And while this court does not interfere with the weight of testimony in law cases, yet it has been our uniform practice to interfere where no substantial testimony supports the verdict, and it has done this very often where no instructions were asked.    [Hartt v. Leavenworth, 11 Mo. 629; Robbins v. Phillips, 68 Mo. 100; Pipkin v. Allen, 24 Mo. 520; Heyneman v. Garneau, 33 Mo. 565; Morris v. Barnes, 35 Mo. 412; McEvoy v. Lane, 9 Mo. 48; Wilson v. Albert, 89 Mo. loc. cit. 544; McFadin v. Catron, 138 Mo. 197; Maddox v. Maddox, 114 Mo. 35; Hewitt v. Steele, 136 Mo. 327.]

The principle announced in defendant's sixth instruction, will be further discussed in discussing the testimony. The rule in regard to the admissibility of a professed expert is that the competency of the witness as an expert must be first affirmatively established, and the opinion of the witness as to his own qualifications is irrelevant and carries no weight with it; and he must have special skill in the subject concerning which his opinion is sought to be given.[Lawson on Expert, etc., Evid. (2 Ed.), pp. 277, 280, 231; Rogers on Expert Testimony (2 Ed.), p. 38, sec. 15, p. 40; sec. 17.]

In Carr v. Northern Liberties, 35 Pa. St. 324, it is said: "Matter of opinion is entitled to no weight with a court or jury unless it comes from persons who first give satisfactory evidence that they are possessed of such experience, skill or science in such matters, as entitles their opinions to pass for scientific truth."

It has been said that "an expert, as the word imports, is one having had experience."    [Ardesco Oil Co. v. Gilson, 63 Pa. St. loc. cit. 151.]    Elsewhere and otherwise expressed, the term implies, in the language of Doe, J., in Jones v.

Tucker, 41 N. H. 546, "one having *special and peculiar* knowledge or skill."

The first alleged expert says he had been professor of physics in Washington University for nearly twenty-four years; had travelled about 10,000 miles, he presumed, and during that time, made experiments on the effect of the train on the air around it, etc., etc. See his testimony heretofore quoted: That a train of twenty or twenty-three freight cars carries along a great deal of air with it, and any one can observe this fact by standing near enough to it; that the effect of a train running six miles an hour would not be appreciable; but that such a train running twenty miles an hour, would have a very appreciable effect. If the conditions were right, there would be a very appreciable effect. A person standing near the train would receive a blow from this air moving with the train, and that blow might be sufficient to topple him over and cause him to lose his footing. That a small boy of about sixty-five pounds, standing near a train running twenty-five miles an hour, the velocity of the air from the train might have the effect of throwing him over, and there would be a further tendency to turn him around slightly—a tendency that would be sufficient to make him roll when he struck the ground, and this would not be the case with a train running six miles an hour. There is nothing in this testimony to show that this witness had ever read in any scientific or other work stating, or had ever made any experiments, showing, that any live animal capable of offering resistance, to-wit, a dog or a cat or a guinea pig or squirrel or chicken, if standing within a foot or two feet of a train running twenty-five miles an hour which had partly passed by, fell and was sucked under the wheels of the cars as they passed. Nor does he say that in his peregrinations of 10,000 miles he had ever observed any such or any similar incident or occurrence.

Of course such testimony to dignify it by that title, with neither knowledge nor experience on which to base it, or with which to back it, is simply worthless; neither courts nor juries are required to believe it; if they do, the esophagi of their credulities must be abnormally dilated, or else permanently enlarged. Opinions such as these, grounded on mere conjecture or speculation, are inadmissible. [Lawson on Expert, etc., Evid. (2 Ed.), p. 498 et seq.; Rogers on Expert Testim. (2 Ed.), pp. 33, 34, sec. 13.]

In Mississippi the Supreme Court of that State, having before it the subject of the competency of experts to impeach the testimony of the mother in a prosecution for bastardy, by testifying that it was highly improbable that impregnation could result from the first act of coition, held such testimony incompetent as being too uncertain, indefinite and hypothetical, to form the ground-work of judicial action or investigation, saying: "The courts, in our opinion, have gone quite far enough in subjecting life, liberty and property of the citizens to the mere speculative *opinions* of men claiming to be experts in matters of science, whose confidence, in many cases bears a direct similitude and ratio to their ignorance. We are not disposed to extend this doctrine into the field of hypothetical conjecture and probability, and to give certainty as evidence, to that which, in its very nature, must be wholly uncertain and unsatisfactory; dependent on circumstances and conditions entirely secret, hidden and unknown, as facts. And without a knowledge of which, neither science nor experience, however great, could afford us the remotest information." [Anonymous, 37 Miss. loc. cit. 59.]

And the last question propounded to witness to the effect if it were possible for the fall of the boy to occur as described by witnesses without the boy striking the train or the train striking the boy, and the answer thereto, was altogether improper. It was one of disputed facts in the case what

caused the injury of the boy, as shown by the answer and testimony in support of it; and an expert is not permitted to testify to such matters. [Lawson on Expert Evid. (2 Ed.), 172.] The same line of remark applicable to the first expert witness applies also to the second one.

5.   But it may be conceded that the testimony referred to in the just-completed paragraph was *really testimony,* and sustained the allegations of the petition as to the boy being *sucked under the cars by the current of air put in motion by the forbidden speed of* the train; still plaintiffs, having proved that, can not recover, because there is no evidence that the principle on which plaintiffs' petition is founded, *was known to defendant, or if known, could have been provided against.* No man is required to anticipate an accident that has never occurred before, or held negligent if he fails to do so. Were the rule otherwise, it would be a lasting and indelible reproach to law, justice, common reason and common sense. In the language of Mr. Wirt in a celebrated case: "Neither the human heart nor the human understanding will bear a perversion so monstrous and absurd, so shocking to the soul, so revolting to reason."

Take a single illustration of so plain a proposition:   A wholesale grocer of the metropolis of Missouri, sends his wagon down to the train loaded with sugar for some distant customer. Now, chemists are aware, so it is said, that sugar contains an ingredient which is the most powerful explosive known to chemistry. While the wagon is on its way to the train, that ingredient becomes aroused into *"pernicious activity"* with the result that the metrical tragedy of the boy on the burning deck is enacted in the crowded streets of St. Louis, and hundreds are slain. Will it be said that the grocer is responsible because he did not anticipate and provide against such an unheard of result? Or, that he ought to have consulted some learned college professor before engaging

in such a hazardous business (as shown alone by the subsequent accident) of shipping sugar to customers? Would not such a suggestion, if heeded and applied, be somewhat in restraint of trade? Will the grocer be held negligent and responsible for an occurrence which had never before been heard of or happened since sugar first became a mercantile commodity? It seems unnecessary to pursue this subject further. The defendant company stands on the same plane in the real case, as does the grocer in the hypothetical one. If the latter is not responsible neither is the former. The only knowledge in the wide, wide world that a train moving at a given rate of speed would generate a current of air that would suck under its grinding wheels a boy nearly twelve years of age if standing in one or two feet of the track, was confined and confided to the two learned professors, who, like the Scottish maiden, the mother of the ghost-child, "hid their secret in their breast," and though they did not, like her, "die in travail unconfessed," yet might as well have done so, so far as informing defendant was concerned.

For these reasons defendant's demurrer to the evidence should have prevailed. Moreover, it should have prevailed for the further reason that the allegations in the petition that plaintiffs' son was "drawn or sucked into and under said train by the force and velocity of said train . . . . which speed and velocity caused a vacuum to form, into which said James Graney fell and was sucked under the wheels of the cars," etc., was not supported by testimony to the effect that the "wind turned him around and made him fall and he rolled under the cars."

I am aware that these views are directly repugnant to what is called the "Fuchs case," 133 Mo. 168; but that case has been repudiated, though not *eo nomine,* in Sullivan's case, 133 Mo. 1, and in American Brewing Ass'n v. Talbot, 141 Mo. 674. See, also, authorities cited in minority opin-

ion, 133 Mo. loc. cit. 201, et seq., which fully support the views herein expressed; indeed, not a single line of court or text-writer can be found to the contrary.

The Fuchs case, decided by a divided court, should, therefore, no longer be followed, and the same is true of this case as first reported. For these reasons we reverse the judgment and remand the cause with directions to the lower court to enter judgment for defendant on the verdict. *Burgess, J.,* concurs except as to the remarks about the instructions; *Robinson* and *Marshall, JJ.,* concur; *Valliant, J.,* concurs in the result; *Gantt, C. J.,* concurs in the result only; *Brace, J.,* dissents.