# CASES DETERMINED

# January Term, 1913.

JOHNSON, Appellant, vs. BERWIND FUEL COMPANY, Respondent.

*April 30—May 31, 1913.*

*Negligence: Failure to adopt best method of doing simple act: Injury: Master and servant: In whose service plaintiff was: Question for jury.*

1. In the simple, ordinary affairs of life a merely incorrect choice of methods, whereby the best method for making a simple movement or carrying out a simple transaction is not adopted, does not constitute negligence where injury to another is an unusual or extraordinary consequence of the method selected.
2. So *held* as to the method by which the front end of a large and heavy box which plaintiff and five other men were carrying was let down to the ground when they came to a narrow place through which they could not pass, as a result of which the plaintiff, who was at the rear end and claims that he did not know that the box was about to be let down in front, strained his back.
3. Upon evidence tending to show, among other things, that a tool box which plaintiff and other men were carrying when he was injured belonged to a contractor who had erected buildings for defendant; that the men had been working for the contractor, but on the morning in question had been taken over by and were in the pay of defendant; and that they had been directed by defendant's superintendent to help move the box in order to get things cleaned up, it is *held* that it was a question for the jury whether the men were at that time acting for and in the service of defendant.

APPEAL from a judgment of the circuit court for Douglas county: FRANK A. ROSS, Circuit Judge. *Affirmed.*

VOL. 154 — 1

*Victor Linley,* for the appellant, cited *Blink v. Hubinger,* 90 Iowa, 642, 57 N. W. 593; *Harrington v. Erie R. Co.* 79 App. Div. 26, 79 N. Y. Supp. 930; *Delaware, L. & W. R. Co. v. Hardy,* 59 N. J. Law, 35, 34 Atl. 986; *Johnson v. Lindsay* (H. L. 1891) 65 L. T. Rep. 97; *Linnehan v. Rollins,* 137 Mass. 123, 125; *Shultz v. C., M. & St. P. R. Co.* 40 Wis. 589; *Cunningham v. Fort Pitt B. Works,* 197 Pa. St. 625, 47 Atl. 846; *Waskiewicz v. Milwaukee E. R. & L. Co.* 147 Wis. 422, 133 N. W. 596.

*W. P. Crawford,* for the respondent, cited *Johnson v. Ashland W. Co.* 71 Wis. 553, 37 N. W. 823; *Wagner v. Plano Mfg. Co.* 110 Wis. 48, 85 N. W. 643; *Bauer v. Richter,* 103 Wis. 412, 79 N. W. 404.

TIMLIN, J. The court directed a verdict for respondent. This respondent had a contract with the Roberts & Schaefer Company for the construction of a briquette plant. This contract was completed and the contractor was cleaning up and removing its tools. Link, the superintendent of respondent, ordered Widen, his foreman, to take his men and move the tool box of the contractor some distance where it could be loaded on a truck. Plaintiff and five other men who were carrying the box at the time of the accident had been working for the contractor and were taken over by the respondent on the morning of the accident and working numbers were given to them by respondent's foreman that morning, which indicated that they were in the pay of respondent. The foreman of the contractor had asked the respondent for men to help them move the box which belonged to the contractor. Widen had orders from respondent's manager to move the box, and the men were ordered by Widen to do so. There was no apparent intention of doing anything further for the contractor, and both the contractor and the respondent apparently desired that this box be removed. There is

some conflict in the testimony, and the plaintiff testifies that he was ordered by the assistant superintendent of the respondent to go and help move the box, and Westlund, one of the men helping carry the box, testified that he was ordered by respondent's foreman to go and help the Roberts & Schaefer Company. The respondent's superintendent testified that he desired to get things cleaned up around there and get things out of the way so as to get the plant started, and the moving of the box appears to be something that was convenient to and desired by both the contractor and the respondent, although after the men in its employment had been sent to help move the box the respondent gave no further directions as to how or where it should be moved. No directions appear to have been necessary except perhaps designating the place of delivery. The moving of the box was the work of a few minutes only, and the men moving it were expected to immediately return to their regular duties as servants of the respondent.

I think under *Shultz v. C., M. & St. P. R. Co.* 40 Wis. 589, it was a question of fact for the jury whether the men engaged in moving the box were at that time acting for and in the service of the respondent. There is nothing in *Johnson v. Ashland W. Co.* 71 Wis. 553, 37 N. W. 823, in conflict with this. The plaintiff and his fellow-servants engaged in moving the box continued "subject to the selection, control, and dominion of the corporation and sustained no relation [to the contractor] under any contract of hire express or implied." *Wagner v. Plano Mfg. Co.* 110 Wis. 48, 85 N. W. 643. There was no indirection about the thing. Whether the respondent undertook to help move this box as an accommodation to the contractor, or as part of its duty under the contract, or pursuant to a desire to clean up its premises and get ready for operations, were questions of intention to be inferred from the instructions given, the temporary nature

of the undertaking, the result to be accomplished, and other facts.

But there is another ground upon which the judgment must be affirmed. Six men were carrying a box six feet long and four feet wide, two men in front, one on each side at the middle, and two at the end. That end of the box which extended in the direction in which it was carried I call the front, and facing in the same direction I speak of the right and left side. The plaintiff was carrying on the rear left-hand corner and one Bennett on the rear right-hand corner, both facing in the direction in which the box was moved. Plaintiff testified:

"The first thing I knew there was the side where I was on got heavier and dropped down and I hollered out then, 'What are you doing? Don't let go of the box;' and by that time in a second the box was down and the rest of them on the other side had let it down too. I see them the time the box got down and the men stand to one side. I was just simply squashed down. The heft of the box squashed me down. I couldn't bend forward, the box was level with my head. It was level with the top of my head so I couldn't bend over it. . . . They didn't give any signal that they were going to let go of the box, nor that they were going to let loose of it. . . . The men in front stopped when they came to this narrow place, didn't go in there. They stopped, couldn't get any further then. Bennett on the right-hand side of me didn't let go of the box before I did. His end of the box was higher than mine was at the time it was set down in front. I couldn't see him at all. I don't know how he did, but his corner was up high and mine was down. The first that I knew that they were going to let the box down was when I notice it get heavier. It just drawed me down, the heft of it. I wouldn't dare to drop it. Well I had to hold on to it. The front end of the box was down at that time. The hind end of it drawed me down with it. . . . When the front end of the box was left down on the ground I still had hold of my end of it. Then it went down. I went down with it. Then it got to the ground. I let it go. I suppose

Bennett let his down the same way. It took about a second's time to let the box down and let it drop—I couldn't hold it there. I was bound to go down with it and that is all the time it took."

Bennett as a witness for plaintiff testified:

"When we came to the boiler and the blocking we couldn't get through and the fellows on the front end of the box let it down. They let it down, and when they let their end down of course we had to let ours down, and we looked at it and decided we couldn't carry the box through there so we up-ended it to get it through. I felt the box go down. Johnson went down on his knees, whether the box pulled him down or whether he slipped and went down I couldn't say—he went down when the box went down. Johnson said nothing at that time. I do not know whether it was said by anybody that the box was going to be let down. . . . After we got to that point the men stopped. The men on the front laid their end of the box down. I and Johnson on the rear laid our end down. . . . We didn't have any difficulty in lifting it. It didn't seem to be too heavy. We handled it all right."

Thomas, another man engaged in carrying the box, testified on the part of the plaintiff:

"When we came to this point where it was kind of tight we let the box down and began to cant it up the hill. We just said—we will let the box down again and cant it up the hill—we made the suggestion among ourselves. Johnson said, 'Don't let it down.' At the time I felt it tipping I didn't hear any warning. . . . It was let down about as evenly as those men could let an object of that kind down."

The fair inference from all this testimony on the part of the plaintiff is that these six men in carrying the box came to a narrow place through which they could not carry the box and the men in front let down their end of the box on the ground, not dropping it, but letting this end down, and that after it was thus let down the plaintiff and Bennett at the rear end let down that end, although the plaintiff, perhaps not knowing of the obstruction in front, exclaimed against

letting the box down.   The plaintiff did not hear any con-
versation among the men to the effect that they were about
to let the box down, but he knew it was being let down.   He
calls this "dropping" the front end, but from all the testi-
mony offered by him, his own and that of his fellow work-
men, it is clearly apparent that he means letting down to the
ground, without any sudden drop, the front end of the box.
I see nothing unusual in this.   It is only when we take
broken fragments of the narrative that the contrary is made
to appear.

Omitting for the present any consideration of the affirma-
tive testimony on the part of the defense that there was no-
tice that the box was about to be let down in front, we have
a case where the plaintiff strained his back while letting down
this box in the manner described.   Where was the negli-
gence?   There were three ways of letting down the box:
(1) To call out and all at once let it drop.   This might break
the box or some of its contents if it had any.   One does not
need the wisdom of a sage to know that boxes are not ordi-
narily dropped in this way.   (2) To let down one end first
and have the two men in the middle move their hands toward
the higher end or stoop with the descending box.   This would
involve some loss of effectiveness on either part.   (3) In the
way in which it was done.

I think every one ought to know that the end upheld was
not as heavy after the opposite end rested on the ground as
it was when the box was being carried in a horizontal posi-
tion.   The higher the upheld end the less weight until it
reached the perpendicular, when the weight would be zero.
Which was the wisest and best way?   The most careful
method?   Not every deviation from the wisest and most per-
fect deportment constitutes negligence.   It would be imprac-
tical to apply the law of negligence to every slight departure
from the best or wisest modes of action in the ordinary, sim-

ple, or trivial affairs of life. Such application of that law would do much to bring it into ridicule and disrepute, and, carried to its logical conclusion, would involve endless considerations of all the little accidents of life, arranging all of the active and many of the inactive members of the human family into plaintiffs or defendants in negligence cases. No reasonably prudent person would infer injury as a natural and ordinary consequence of his failure to perform such simple duties in the best or wisest manner. *Brossard v. Morgan Co.* 150 Wis. 1, 136 N. W. 181, and cases cited. We may concede that the plaintiff strained his back in setting his end of the box down, but that is an unusual and extraordinary consequence of letting down a box in this way. Letting down a box in the manner described is a very ordinary occurrence, and it is not within the duty governing ordinary diligence and prudence to anticipate any injury to another from this action because the injury is the remote, unusual, and extraordinary consequence of the simple act.

When we take up the testimony for the defendant, we find that Westlund, one of the men who helped carry the box on the left side, testified: "We didn't let it drop, we let it down evenly. I did not let it go before the rest of the men did. Anderson didn't either. When it was let down it was set down at the same time after somebody said, 'We can't get through here, we are going to set it down.'"

Anderson, who carried the front left-hand corner, testified for respondent: "There was a place there that was kind of hard to get through. When the men got there they all set it down. Somebody hollered out, 'Set it down.' We all set it down together."

The case might be affirmed on the ground that there was affirmative evidence that there was warning given, and the evidence on the part of the plaintiff, properly interpreted, merely went to the point that he did not hear the warning. But

I prefer to rest it on the broad ground that in the simple, ordinary affairs of life a merely incorrect choice of methods, by which the best method for making a simple movement or carrying out a simple transaction is not adopted, will not constitute negligence where injury to another from the method selected is an unusual or extraordinary consequence of such method.

. *By the Court.*—The judgment is affirmed.

SIEBECKER and KERWIN, JJ., dissent.