FIRST WISCONSIN TRUST COMPANY, Administrator, Appellant, vs. CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY, Respondent.

*May 7—June 5, 1923.*

*Master and servant: Death of employee: Negligence of employer: Using safe but not most approved method of work: Failure to warn employee of risk: Knowledge of employee.*

1. In an action to recover damages for the death of a railroad shop employee who was injured by the slipping of a half-round tool used, instead of a swedge, for bending a metal strap of unusual size, the evidence is *held* not to present a jury question as to whether the defendant was guilty of negligence in adopting the method used.

2. Where the method adopted was one by the use of which injury to a workman was an unusual and extraordinary consequence, its use did not constitute negligence, even though the method was not the most approved.

3. Nor could negligence be predicated on the fact that the hammer-smith held two of the half-round tools, one in each hand, when one of the tools causing the injury was forced from its position by a blow of the steam hammer.

4. Where deceased had been engaged in defendant's railroad shops for a number of years and had frequently been called upon to render similar service he was as well informed with respect to the hazard attendant upon the work as any one else so that negligence could not be predicated on failure to warn him.

APPEAL from a judgment of the circuit court for Milwaukee county: C. M. DAVISON, Judge. *Affirmed.*

This is an action to recover damages for the wrongful death of plaintiff's decedent. The decedent was an employee of the defendant, in the capacity of furnace-man, in its car-repair shops in Milwaukee. On December 7, 1920, the deceased was assisting in bending a U-shaped strap for a main rod on an L3 locomotive engine. The strap was being made from a piece of metal eight or nine inches in diameter and six feet in length. This piece of metal was first heated in the furnace, then placed under a steam hammer and flat-

tened down. After it was flattened down the crew started to bend it in the following manner: The metal was placed on the hammer table under the steam hammer. Two half-round tools, each consisting of a piece of steel eight or nine inches long, four or five inches high, flat on one side and half-round on the other, with an iron handle six or seven feet long, about the dimensions of a broomstick, with a loop at the end for the hand or grasp, were first placed on the hammer table, and these half-round tools supported the metal bar at either end thereof. The flat part of these tools rested on the hammer table and the metal bar rested on the round portion thereof. Another half-round tool was placed on top of the metal bar in the center thereof and immediately under the steam hammer; the round part of the tool placed on top of the metal bar resting thereon so that the flat surface was on top. The hammer-smith held the upper tool in his left, and one of the lower tools in his right, hand. He held them by grasping the loop at the end of the handle with his hand. Another helper similarly held the other half-round tool, and the deceased was assisting in holding the metal bar in position with a pair of long tongs. During the operation the half-round tool held in the foreman's right hand slipped with great force from its position and the handle of the tool struck the deceased on the shin, causing an abrasion of the skin and perhaps a bruise to the bone. The injury did not seem serious at first, but it refused to heal. The deceased was eventually taken to the hospital, where he died on April 12, 1921.

At the close of the testimony the trial court directed a verdict in favor of the defendant, and from the judgment entered thereon plaintiff brings this appeal.

*Oliver L. O'Boyle* of Milwaukee, for the appellant.

*H. J. Killilea* of Milwaukee, for the respondent.

OWEN, J. A principal controversy in the case was whether the deceased was engaged in interstate commerce

at the time of the injury, it being the contention of the defendant that he was so engaged and that under the federal Employers' Liability Act the defense of assumption of risk is available to it. The plaintiff contends that he was not so engaged, that the defendant's liability is to be determined by the laws of this state, and that, as the defendant had elected not to come under the provisions of the workmen's compensation act which is applicable to the shop employees of railroad companies, the defense of assumption of risk is not available to the defendant. We find it unnecessary to determine this question, as the evidence fails to establish negligence on the part of the defendant.

The following grounds of negligence are alleged in the plaintiff's complaint: (a) that said defendant failed to adopt a safe method of performing the operation in process at the time of and immediately prior to the aforesaid injury to plaintiff's intestate; (b) that the defendant failed to exercise ordinary care in the operation of the hammer and tool at and immediately prior to the injury to this plaintiff's intestate; and (c) that the defendant failed to warn deceased of the hazard attendant upon the particular work he was required to do at and immediately preceding the aforesaid injury. To establish the first ground of negligence, the plaintiff called as witnesses a blacksmith in charge of the forging department of the Falk Manufacturing Company, the superintendent of forging and die sinking of the International Harvester Company, and the superintendent of the forging department of the Allis-Chalmers Manufacturing Company. The substance of the testimony of these witnesses was that the method employed in bending the strap was not the modern and approved method followed in blacksmith shops generally; that the modern method was to use either a swedge or saddle instead of the half-round tools. They testified that they did not know the customary way of doing this sort of work in railroad shops. The evidence on the part of the defendant was to the effect that straps of the

unusual size of the one worked upon at the time of the injury were universally bent in railroad shops by the method employed in the instant case. The testimony showed that swedges and saddles constituted a part of the tool equipment of the defendant's Milwaukee shops, but that they had no swedge large enough to bend this particular strap; that they were called upon but rarely to bend a strap of such size, and that to make a swedge of sufficient size to do this work would cost in the neighborhood of $100. Numerous witnesses having long experience in railroad shop work testified that they had never seen a half-round tool fly from its position under pressure, and that they had never heard of an injury resulting from the use of such tools. In fact, there is no testimony in the case of any accident or injury having resulted from their use. Although plaintiff's witnesses were asked to give their opinion as to the safety of this method, answers to which were excluded by the court (whether correctly we do not decide), there is no evidence to show that the method adopted is in fact an unsafe method or that it ever resulted in injury. No witness in the case was able to furnish any reason for the slipping of this tool. It seemed to be conceded by all to have been an extraordinary incident and the result of a pure and unexplainable accident. The testimony of plaintiff's expert witnesses leaves the impression that while the swedge or saddle is in general use in many factories and so-called blacksmith shops, they are used for bending straps of what may be termed a stock size and are used for economical rather than safety reasons. But this strap was of an extraordinary size. The evidence shows that the Milwaukee shops were called upon to bend a strap of this size on an average of once in two years; that the making of a swedge for the purpose of bending this strap would cost $100, and that there would be no production economy in making a swedge suitable for the bending of this size strap. One of the witnesses for plaintiff, pressed upon cross-examination as to whether he would have made a

swedge for the bending of this strap, was asked this question: "*Q.* Now if you could do it in the way that you had done for twenty-five years, and there never had been an accident, would you have gone on and done it in this way? *A.* It seems that I would." Viewing the evidence on the assumption that questions propounded to plaintiff's witnesses with reference to the safety of the method employed were answered by the witnesses in plaintiff's favor, we do not think the record presents a jury question as to whether the defendant was guilty of negligence in adopting the method used. Even upon such assumption the record is barren of substantial evidence that the method pursued was dangerous to employees. Nor do we think that it is a fair inference from the record that the saddle and swedge have been substituted in some factories for the half-round tools as the result of considerations of safety. It is apparent that the swedge and saddle are used to promote economy in production. Even though the method used was not the most approved method for making the saddle, it was a method by the use of which injury to another was an unusual and extraordinary consequence. Under such circumstances its use does not constitute negligence. *Merton v. Mich. Cent. R. Co.* 150 Wis. 540, 137 N. W. 767; *Johnson v. Berwind Fuel Co.* 154 Wis. 1, 141 N. W. 1018; *Klosky v. Payne,* 173 Wis. 600, 181 N. W. 294; *Chicago & N. W. R. Co. v. Bower,* 241 U. S. 470, 36 Sup. Ct. 624; *Washington & G. R. Co. v. McDade,* 135 U. S. 554, 570, 10 Sup. Ct. 1044; *Patton v. Texas & P. R. Co.* 179 U. S. 658, 664, 21 Sup. Ct. 275; *Graney v. St. Louis, I. M. & S. R. Co.* 157 Mo. 666, 57 S. W. 276, 50 L. R. A. 153, 159.

Negligence is also predicated upon the fact that the hammer-smith held two of the round tools, one in each hand. It is said that he should have used both hands to hold one tool. The evidence to support this conclusion is very meager. One of plaintiff's expert witnesses was asked this question: "*Q.* What have you to say from your experience

as a hammer-smith as to the practice of one man holding two tools? *A.* That has often been the case, but it is not hardly proper." The court struck out the words "but it is not hardly proper." Another witness testified as follows: "When it is standing on the head of the hammer, with a man holding it by the handle, it does not make any difference whether he has two hands or not, as regards the head flying off, provided the steel is hot. He should hold it in two hands." When it is realized that the round tool was forced from its position by a blow from a steam hammer, it is difficult to imagine that the strength of man applied at the end of the handle six or seven feet from the tool could have been sufficient under any circumstances to have prevented the dislodgment of the tool. This contention seems wholly untenable.

As to the third ground of negligence, that the defendant failed to warn this plaintiff's intestate of the hazard attendant upon the particular work he was required to do at and immediately preceding the aforesaid injury, it is sufficient to say that we have already concluded that there was no hazard attendant upon the work as then and there performed, and, furthermore, that the deceased was as well informed upon that subject as any one else, as he had been engaged in the shops for a number of years and had frequently been called upon to render similar service. Upon no view of the evidence, considering that excluded as well as that admitted, can we discover any negligence on the part of the defendant. It follows that the trial court properly directed a verdict in favor of the defendant.

*By the Court.*—Judgment affirmed.