"The jurors for the State, upon their oath, present: That the Southern Railway Company, being a railroad company late of the county of Guilford, on 15 December, 1895, it being Sunday, with force and arms, at and in the county aforesaid, unlawfully and willfully did permit a car, train of cars, and a locomotive to be run on its railroad in (816) Guilford County, between the hours of sunrise and sunset, and after for the purpose of transmitting the United States mail either with or 9 o'clock a. m., the said car, train of cars and locomotive not being run without passengers, nor for carrying passengers exclusively.
"Nor was said car, train of cars and locomotive run for the purpose of transporting fruits, vegetables, live-stock or perishable freights exclusively, against the form of the statute in such cases made and provided, and against the peace and dignity of the State."
F. M. Keith, witness for the State, testified:
"On Sunday, 15 December, 1895, in company with Mr. Cooper I was going from Greensboro, in Guilford County, to a church in the country *Page 510 
to attend religious services, when outside of Greensboro we met a freight train on the Southern Railway between Pomona and Greensboro. It was 10 o'clock a. m., Sunday morning, and the train was running fifteen or twenty miles an hour. It was some two miles from Greensboro, between the latter place and Pomona. Pomona is about three miles from Greensboro, between Greensboro and Jamestown, on the railroad from Greensboro to Charlotte. The train was drawn by a locomotive, and had eighteen or twenty freight cars and caboose behind. Two of the cars were open. Saw lumber in one of these, coal in the other, I think. Took out my watch and saw that it was 10 o'clock. Don't know what was in the others cars. They were closed and sealed up. Heard the train coming some distance before we met it. It was coming from the direction of Jamestown."
 N.M. Cooper, witness for the State, testified in substance to the same facts, and the State closed.
(817) J. R. Royall was introduced for defendant, and testified:
"Was conductor of the train which witnesses Keith and Cooper met between Pomona and Greensboro on Sunday morning, 15 December, 1895. The train was a through freight from Charlotte, North Carolina, to Danville, Virginia. It started from Charlotte at 8:30 p. m. Saturday, 14 December, and was due in Danville at 7 a. m. Sunday following. It was a freight train loaded with general freight — some eighteen or twenty cars for Danville and other points beyond Danville, in Virginia, and other States north of Virginia.
"We left Charlotte on time, and would have reached Danville at 7 a. m. Sunday but for delays which occurred. We arrived (after leaving Charlotte at 8:30 p. m., as before stated) at Salisbury, N.C. at 12 midnight. Here we took on some cars from the Western North Carolina Railroad loaded with freight for Danville, Virginia, and other points north of Danville. We left Salisbury at 12:50 a. m. and arrived at Lexington about half after 1. We were delayed at Lexington in order to let the train for Atlanta pass going south. It was a passenger train and had the right of way, and I had to take the side track with my train. I left Lexington at 3:57 a. m., arrived at Thomasville at 4:25 a. m. Left Thomasville at 5:26 a. m., having been detained there for another train which had the right of way. Arrived at High Point at 5:50 a. m.; left High Point at 5:55 a. m.; arrived at Jamestown, ten miles from Greensboro, at 6:15 a. m. At Jamestown my train was again sidetracked to allow passenger trains having right of way to pass, and I was compelled to remain at Jamestown until 9:25 a. m.
"It was during the Atlanta Exposition, and there were many extra passenger trains being run on the road. *Page 511 
"Left Jamestown at 9:25 a. m.; arrived at Pomona at 9:57 (818) a.m. and at Greensboro at 10:25 a.m.
"I could not remain at Jamestown during Sunday because I could not get water or coal therefor the locomotive, nor could I get subsistence there for the train crew. Greensboro was the nearest point where water and subsistence could be had, so I went to Greensboro and stopped for the day. If the locomotive had stood all day the water would exhaust, and it would be necessary to have water to start again. It is 144 miles from Charlotte to Danville, and from 8:30 p.m. to 7 a.m. is plenty of time for the trip."
Upon cross-examination this witness said that there was a tank of water at Jamestown which is ordinarily used by trains, but on this occasion there was no water in it; that at Jamestown there are several stores and dwelling-houses, and that most of the crew carried their own provisions with them; that they had no provisions that day; that this train was hauling cars loaded as described by the witness F. M. Keith, and that Greensboro was a more preferable and convenient place for him to stop on Sunday than Jamestown.
This concluded the testimony.
The defendant then requested the court to charge the jury:
"1. That if the train was a through freight train from Charlotte, N.C. to Danville, Va., carrying freight from one State to another, the North Carolina statute would not apply, and the defendant would not be guilty.
"2. That the North Carolina statute does not apply to trains running on Sunday carrying interstate freight or commerce, and if from the evidence the jury was satisfied that such was the character of the train in question, the defendant would not be guilty.
"3. That if the train in question was started at 8:30 p.m. on (819) Saturday from Charlotte, destined for Danville, Va., where it was due at 7 a.m. Sunday, and by reason of unexpected and unavoidable circumstances the train was delayed so that it ran from Jamestown to Greensboro, ten miles, after 9 a.m. Sunday, the defendant would not be guilty.
"4. That in order to constitute guilt in this case the violations of the terms of the statute must be willful, and unless it was the defendant would not be guilty.
"5. If the train started, as testified by Royall, from Charlotte at 8:30 p.m. Saturday, for Danville at 7 a.m. Sunday, and was delayed as testified by Royall, that such delay was unavoidable, and as further testified by Royall, it was necessary to reach Greensboro in order to get water and coal and subsistence for the crew, then the running from *Page 512 
Jamestown to Greensboro after 9 a.m. Sunday morning was not willful and the defendant would not be guilty."
The court refused these instructions, and instructed the jury if they believed the testimony the defendant was guilty. Defendant excepted to the court's refusal to give instructions as asked. There was a verdict of guilty, and from the judgment thereon the defendant appealed.
The statute (The Code, sec. 1973) under which the indictment is drawn is not unconstitutional. Although it affects interstate commerce to some extent, there is nothing in its provisions which suggests a purpose on the part of the Legislature to interfere with (820) such traffic, or indicative of any other intent than to prescribe in the honest exercise of the police power a rule of civil conduct for persons within her territorial jurisdiction. Such a law is valid and must be obeyed unless and until Congress shall have passed some statute which supersedes that act by prescribing regulations for the running of trains on the Sabbath on all railway lines engaged in interstate commerce. Hunningtonv. Georgia, 163 U.S. 299. While the State may not interfere with transportation into or through its territory "beyond what is absolutely necessary for its self-protection," it is authorized in the exercise of the police power to provide for maintaining domestic order, and for protecting the health, morals, and security of the people. Railway v. Van Husen,95 U.S. 470, 473. Congress is unquestionably empowered, whenever it may see fit to do so, to supersede by express enactment on this subject all conflicting State legislation. But, until its powers are asserted and exercised, the statute under which the indictment is drawn may be enforced and will constitute one of the many illustrations of the principle that the States have the power, at least in the absence of any action by Congress, to pass laws necessary to preserve the health and morals of their people, though their enforcement may involve some slight delay or disturbance of the transportation of goods or persons through their borders. Morgan v. Louisiana, 118 U.S. 455, 463; Hunnington v.Georgia, supra, at page 314; Smith v. Alabama, 124 U.S. 465,474, 479, 482; Bagg v. R. R., 109 N.C. 279.
The statute (Code, sec. 1973) declares the running of any such train as that in question is admitted to have been, after 9 o'clock on Sunday morning, to be a misdemeanor. It is not denied that the train arrived at Greensboro at 10:25 a.m. on Sunday. The State, therefore, (821) established prima facie the guilt of the defendant. If the defense relied upon was that it was necessary to run after the hour fixed as the limit by statute in order to preserve the health or to save the lives *Page 513 
of the crew employed on the train, or relieve them from severe suffering, it was incumbent on the defendant to show to the satisfaction of the jury that the act was done under the stress of such necessity in order to excuse it as not in violation of the spirit though in conflict with the letter of the law. S. v. Brown, 109 N.C. 802; S. v. McBrayer, 98 N.C. 619. The evidence is not sufficient in any aspect of it to excuse the running of the train after 9 o'clock. Admitting that it was impossible to procure water at the tank at Jamestown (though the fact shown was not that the tank could not have been filled by pumping, but that it was empty) or supplies of food for the crew, non constat, but that both food and water could have been obtained in sufficient quantity at any town or station on the road west of Jamestown. In fact, the testimony tends rather to show that those who directed the movements of the train had abundant reason for anticipating further delays, and ought, therefore, to have ordered it to lie over sooner. The authorities of the road ought to have been aware that in such a busy time, when so many trains were in motion, they ought, in the exercise of ordinary care, to have ordered the train to move onto the siding in time to avoid any risk of violating the law. The proof offered falls very far short of excusing the act, denounced as a violation of law, by showing that it could not have been obeyed by the exercise of due precaution without imminent risk of endangering the lives or health of the crew on board the train. For the reasons given the judgment of the court below is
AFFIRMED.
Cited: S. v. Rogers, ante, 796; S. v. R. R., 145 N.C. 550, 573, 575;S. v. R. R., 149 N.C. 476; Davis v. R. R., 170 N.C. 600.
(822)