WILLIAM SIDNEY DAVIS v. SOUTHERN RAILWAY COMPANY.

(Filed 12 January, 1916.)

**1. Railroads—Negligence—Pedestrians—Schedules—Speed of Trains.**

A person using a railroad track for a footway, whether as trespasser or licensee, does so subject to the superior right of a railway company to have the unimpeded use thereof for the operation of its trains while serving the public in transporting passengers and freight; and the railroad company is not under any legal obligation to observe the convenience of such persons in making the schedules of their trains or regulating their speed.

**2. Same—Danger Implied—Presumption.**

Trespassers or licensees using the track of a railroad company as a passway have, from the nature of their surroundings, at least implied knowledge of its danger, and are required to observe a proper degree of care for their own safety in doing so; and the engineer on a passing locomotive may reasonably expect that a person walking along the track in front, who is in apparent possession of his faculties, will leave the place of danger in time to avoid his own injury by being run upon or struck by the moving train.

**3. Same—Passing Train—Vortex—Accidents.**

The plaintiff, with a companion, both in full possession of their faculties, were walking along a railroad track paralleling that of the defendant, the plaintiff on the sills outside of the rail, the ends of which sills were 5½ feet from the ends of the sills of the defendant road. The plaintiff's companion informed him of an approaching train, but he continued on his way, and as the train passed he was injured by falling, in some way, beneath it, claiming it resulted from the vortex caused by the train: *Held,* had this been the cause, it was an accident which could not have reasonably been anticipated by the defendant's engineer, and afforded no evidence of actionable negligence.

**4. Railroads—Negligence—Evidence—Sunday Laws—Movement of Trains— Proximate Cause—Commerce.**

In an action to recover damages for a personal injury alleged to have been caused by the negligent running of the defendant's train, the mere fact that the train was being run on Sunday in violation of a statute of the State is no evidence of a violation by the defendant of its duty owed to plaintiff, injured while using the track as a walkway, and it also lacks the element of proximate cause necessary to sustain a verdict; and this is especially so when the train was an interstate one and not controlled by our statute.

**5. Evidence—Judicial Notice—Railroads—Grades—Speed of Train.**

In an action to recover damages for a personal injury alleged to have been caused by plaintiff's having been drawn within the vortex of defendant's rapidly moving train, it appeared from the evidence that the train was a freight train of forty-six cars drawn by two locomotives, which had stopped at a water tank, about 448 feet down a heavy grade from the place of the injury, and 200 feet after starting it was going at a speed of 6 or 8 miles an hour. *Held,* the Court will take judicial knowledge that the speed of the train at the place of the injury could not have been 25 or 30 miles an hour at the time the injury was inflicted, though there was some slight evidence to the contrary.

DAVIS *v*. R. R.

**6. Judicial Knowledge—Railroads—Vortex—Passing Trains.**
> The plaintiff claims that he was drawn into the vortex of defendant's rapidly passing train, which caused the injury complained of. *Held*, the Court will take judicial knowledge of the fact that the force would be centrifugal from the side of the train, and would cause him to fall outward, instead of creating a vortex which would carry him beneath the train.

ALLEN, J., concurring; CLARK, C. J., dissenting; HOKE, J., concurring in the dissenting opinion.

APPEAL by plaintiff from a judgment of nonsuit rendered by *Daniels, J.,* at April Term, 1915, of WAKE.

The plaintiff, on July 17, 1910, it being Sunday, was walking with a companion, Tom Jennings, on that part of defendant's right of way which lies between the city of Raleigh and Pullen's Park, which is about a mile west of defendant's station at Raleigh. There are two tracks laid on said right of way from Raleigh to Cary, about 8 miles distant, which tracks are parallel to each other, with 8 feet of space between the inside rails of each track, or those nearest to each other, the rails being about 1½ feet from the ends of the cross-ties on the same side, leaving a space of about 5 or 5½ feet between the ends of the cross-ties of the two railways. Plaintiff and Jennings were walking towards Pullen Park, in a westwardly direction, about 11 o'clock Sunday morning, Jennings between the rails of the Seaboard Air Line Railway track, which was laid on said right of way parallel with defendant's track, as above stated, and plaintiff on the ends of the cross-ties next to defendant's track. Jennings heard a distant freight train coming on the defendant's track from the direction of Raleigh and going west. It was an interstate train, hauling cars through this State from Pinner's Point, Va., to Birmingham, Ala., and other cities in the south and west. There were forty-six cars in the train, of which forty-five were loaded with interstate freight, and at the time of the accident the train was proceeding from Selma, N. C., to Greensboro, having just before stopped at the Raleigh tank for water. The grade from the tank to Pullen's Park was a heavy one. The estimates of the speed of the train, at the time plaintiff was injured, were conflicting, some witnesses testifying that it was as low as from 3 to 6 miles and others that it was as much as 25 to 30 miles. The train was drawn by two engines, called a double-header. When Jennings heard and saw the train coming in the same direction they were going, he warned the plaintiff by telling him to look out for it, the train being some distance from them when he first heard it. He stated that he thought they were a safe distance from the oncoming train. Sidney Davis testified that when he looked back the two engines were abreast of them and shortly afterwards he was drawn under one of the cars by the suction which was caused by the speed of the train, and his leg mashed. There was some very strong

and disinterested testimony for the defendant that the train was running slowly, under Boylan's Bridge, up the heavy grade, and that no suction could have been produced, and other evidence that even at a greater rate of speed than 30 miles an hour trains had frequently passed close to section hands, who were repairing the tracks, without any such effect being produced; also that the effect produced by a rapidly moving train would be merely to split the air and drive objects away from it, such as dust from the track and hats from the heads of men standing near it, the force of the wind being away from the train rather than towards it.

There was a verdict for the plaintiff, which the court set aside for the reason that there was no evidence to support it, and entered a judgment of nonsuit. Plaintiff appealed.

*W. H. Lyon, Jr., and Manning & Kitchin for plaintiff.*
*A. B. Andrews for defendant.*

WALKER, J., after stating the case: The evidence must be considered in the view most favorable to the plaintiff.

This Court has held so frequently as to have made it an axiom of the law that a person using the track of a railroad company for a footway, whether as trespasser or licensee, does so subject to the undoubted and superior right of the railway company to have the unimpeded use thereof for the operation of its trains, while serving the public in transporting passengers and freight. It is bound by the law to receive passengers and freight and to carry them, by the exercise of care and diligence, to their destination, and, therefore, it is not so much the railroad company which is thus favored and preferred by the law over a trespasser and licensee walking on or dangerously near its tracks, as the public, although the railroad company has, independently, rights and privileges with respect to its tracks and rights of way which are not permitted by the law to be abridged in order to accommodate those who for their own convenience and at their own will and pleasure use them as footways. By reference to the numerous cases upon this subject which have been decided by this Court it will be seen that it has been held positively, unequivocally, and uniformly by us that the principle which gives to the railroad company, while serving the public, this superior and exclusive right to the use of its tracks and its right of way is not in the least modified by anything having reference to the speed of the train. *McAdoo v. R. R.,* 105 N. C., 140; *High v. R. R.,* 112 N. C., 385; *Abernathy v. R. R.,* 164 N. C., 91; *Ward v. R. R.,* 167 N. C., 148, and cases therein cited, or to the fact that it was accustomed to run at a certain speed, nor because it was contrary to usage or custom to run on Sunday, if such was the fact in this case.

A railroad company is not under any legal obligation to regulate the rate of speed of its trains for the convenience of those using its right

of way, for its tracks are always places of danger, and the pedestrian, who can easily step aside and avoid any danger, should do so on the approach of a train.  He cannot require the company to slow up any more than to stop.  He must look out for trains and take care of himself, and the engineer has the right to suppose that he has done so, or that he will do so in time to save himself.  He must expect trains at all times, for he does not control the schedules of the company, and, besides, it has the right to run extra trains and to use its tracks for its purposes at any hours it chooses in the transaction of its business as a public carrier, and cannot be lawfully obstructed or impeded in the prosecution of this right or prevented from its free and full exercise in order to take care of those who go upon its property as trespassers or as licensees, who are there by sufferance only.  ·It must not willfully or heedlessly injure them; but as they are not invited upon the right of way in any sense other than that the railroad company had not taken steps to prevent its use by them as a footpath, they are required to look out for their own safety.

*Justice Avery,* speaking for the Court in *High v. R. R.,* 112 N. C., 385, said: "Whether he saw the plaintiff at a distance of 150 yards or of 10 feet, he was not at fault in acting on the supposition that she would still get out of the way.  It is not material whether the train was moving fast or slow in such a case as this.  For present purposes the relative condition of the parties would have been the same had the engine been moving 50 miles an hour and had she been discovered on the track at a distance that would be traversed in the same time that would have been consumed in going 10 feet at the rate of 10 miles an hour, unless additional liability should have been incurred by running so fast in a populous town."  And again, in the same case: "If the plaintiff had looked and listened for approaching trains as a person using a track for a footway should in the exercise of ordinary care always do, she would have seen that the train, *contrary to the usual custom,* was moving on the siding.  The facts that it was a windy day and that she was wearing a bonnet, or that the train was late, gave her no greater privilege than she would otherwise have enjoyed as licensee, but, on the contrary, should have made her more watchful."  He then goes on to say that as the woman was apparently in possession of her normal faculties, and her natural senses of sight and hearing, there was nothing which required the engineer to depart from the usual rule, that the servant of the company is warranted in expecting that trespassers or licensees, seemingly of sound mind and body and in possession of their senses, will leave the place of danger till it is too late for him, by stopping the train or slackening its speed, to prevent a collision, citing especially in support of these propositions, so thoroughly established in our law, the cases of *McAdoo v. R. R.,* 105 N. C., 140; *Meredith v. R. R.,* 108 N. C.,

616, and *Norwood v. R. R.,* 111 N. C., 236. In other words, it was held that if the mental and physical condition of the person on the track is such as to indicate that he is capable of caring for himself, the engineer is under no duty or obligation to take care of him by even slowing down his engine; and *Justice Avery,* in *High's case,* distinguishes from it those of *Deans v. R. R.,* 107 N. C., 686 (where the man was lying apparently helpless on the track); *Bullock v. R. R.,* 105 N. C., 180 (where the horse and wagon had stalled on the track and a signal given to stop), and *Clark v. R. R.,* 109 N. C., 430 (where the party was handicapped by being on a trestle); but in all cases where the person on the right of way is not helpless, or disabled in some way, the above rule applies with its full force.

In *Abernathy v. R. R.,* 164 N. C., 97 and 98, the Court, quoting, in part, from and approving *Glenn v. R. R.,* 128 N. C., 184, said: "The railroad track itself was a warning of danger, made imminent by the approaching train. It was then his duty to keep his 'wits' about him and to use them for his own safety. He knew or ought to have known that he was a trespasser, and it was his duty to have gotten out of the way of the train. The defendant was under no obligation to stop its train at the sight of a man on its track. . . . It was apparent to the engineer that the plaintiff was in full possession of his faculties and could take care of himself, and the engineer had the right to presume that he would leave the track in time to avoid the injury. 'That he did not do so was his own fault, and he should suffer the consequences of his folly.' The doctrine of the cases already cited and decided in this Court has been firmly established in other jurisdictions, and notably in *R. R. v. Houston,* 95 U. S., 697, where it is said that a person using the track of a railroad company must look and listen, and any failure to do so will deprive him of all right to recover for any injury caused thereby." A party cannot walk carelessly and blindly into a place of danger, and hold any one but himself to blame for the resultant injury. It was also said, in that case, that the plaintiff, as here, was in full possession of his faculties and able to take care of himself, and the engineer, therefore, had the right to presume up to the last moment, when it was too late to save him, that he would leave his dangerous position in time to avoid injury to himself, and that he did not do so was his own fault, and he should suffer the consequences of his folly. *Volenti non fit injuria.*

There are so many cases to the same effect, which have been decided in this Court, that it would be useless and tedious to review them, and we will content ourselves with merely citing them, except one or two of recent date. *Parker v. R. R.,* 86 N. C., 221; *McAdoo v. R. R., supra; Meredith v. R. R., supra; Norwood v. R. R., supra; High v. R. R., supra; Syme v. R. R.,* 113 N. C., 558; *Bessent v. R. R.,* 132 N. C., 934;

*Stewart v. R. R.,* 128 N. C., 518; *Wycoff v. R. R.,* 126 N. C., 1152; *Sheldon v. Asheville,* 119 N. C., 606; *Beach v. R. R.,* 148 N. C., 153; *Lea v. R. R.,* 129 N. C., 459; *Morrow v. R. R.,* 147 N. C., 623; *Treadwell v. R. R.,* 169 N. C., 694.

The recent cases of *Abernathy v. R. R.,* 164 N. C., 91, and *Ward v. R. R.,* 167 N. C., 148, have fully affirmed all of the principles settled by the above authorities. They are specially mentioned here, and in this connection, as in both of them, it was contended by the plaintiffs therein that they were on that part of the right of way where they did not expect trains to come at the time they were injured, and that this fact varied the rule; but this Court held, contrary to that view, that such a place is always one of danger, as the company has the right to the free and unimpeded use of its tracks, at all times, for its regular or extra trains, and that outsiders must keep off, or, if they insist on using the right of way for their own purposes, they must take care of themselves. It was further said, following a court of the highest authority, that under such circumstances the right of way itself is a place of danger, as it seems necessary to repeat with emphasis, and a warning to all who would use it as a footway. In the *Ward case,* at p. 155, the Court thus referred to *Neal v. R. R.,* 126 N. C., 634: "It was there said that if a person is walking on a railroad track in open daylight, and has an unobstructed view of an approaching train, and is nevertheless run over and injured, he is guilty of such negligence as deprives him of the right to recover damages; and this is so even though an ordinance of a town, as to the train's rate of speed, was being violated at the time, or the bell was not rung as required by the ordinance, or a lookout was not kept by the engineer or fireman, the injury being referred by the law to the plaintiff's own negligence as its proximate cause, citing *McAdoo's case, Syme's case, Meredith's case, Norwood's case, High's case,* all *supra."*

*Justice Hoke,* in two recent cases, has clearly and forcefully stated the true doctrine: "We have held in many well considered cases that the engineer of a moving train who sees, on the track ahead, a pedestrian who is alive and in the apparent possession of his strength and faculties, the engineer not having information to the contrary, is not required to stop his train or even slacken its speed because of such person's presence on the track. Under the conditions suggested, the engineer may act on the assumption that the pedestrian will use his faculties for his own protection and will leave the track in time to save himself from injury." This was said by the learned justice in *Talley v. R. R.,* 163 N. C., 567, citing *Beach v. R. R.,* 148 N. C., 153, and *Exum v. R. R.,* 154 N. C., 408, and in *Hill v. R. R.,* 169 N. C., 740, and on the same day that case was decided, we again reaffirmed the principle in *Treadwell v. R. R.,* 169 N. C., 694, saying in regard to it: "It can never be assumed that trains

are not coming on a track at a particular time when it is being used for the convenience of trespassers or licensees, and, therefore, that there can be no risk to a pedestrian from them. In the cases above cited this Court held, as it did also in *Beach v. R. R.,* 148 N. C., 153, that a railroad track is intended for the running and operation of trains, and not for a walkway, and the company owning the track has the right, unless the statute has in some way restricted that right, to the full and unimpeded use of it. The public has rights as well as the individual, and usually and reasonably the former are considered superior to the latter. That private convenience must yield to the public good and public accommodation is an ancient maxim of the law. If we should for a moment listen with favor to the argument, and eventually establish the principle, that an engineer must stop or even slacken his speed until it may suit the convenience of a trespasser on the track to get off, the operation of railroads would be seriously retarded, if not made practically impossible, and the injury to the public would be incalculable. The prior right to the use of the track is in the railway, especially as between it and a trespasser who is apparently in possession of his senses and easily able to step off the track. He has the advantage of the company, whose train can run only on its track, and besides is using its property gratuitously for his own pleasure and convenience, and if he has implied license to do so, it must be considered as held, and the privilege must be exercised, subject strictly to the company's right to use its tracks for running its trains."

The principles heretofore adopted and applied by us in the cases to which we have referred seem to have met with approval in all other courts, and they certainly accord with our sense of justice and fairness.

Public carriers are held to a strict accountability in the discharge of their duties of receiving and transporting freight and passengers, and heavy penalties have been imposed by statutes for failure to do so, or for delays in doing so. In order to discharge this legal obligation to the public, sometimes very onerous at the best, they are compelled to have fixed schedules for their regular trains and also to run extra trains to accommodate the public and to perform their duty, and their trains are, therefore, constantly in operation, day and night.

The track laid under the Boylan Bridge was a main track and always live, and one on which a train might pass at any time. But plaintiff also had actual notice of the train's approach, for his companion, and his own witness, warned him of it by telling him to "look out." Why tell him to do so, if there was no danger anticipated from the coming train when it passed them? And there is another very pertinent question, Why did plaintiff not hear the train as well as his companion, who was walking with him and right by him? He did not look, or he would have seen it, as it was in plain view, on a straight track in the broad

daylight. He did not listen, for if he had done so he would have heard it, for his companion, Tom Jennings, both saw and heard it.

There are other considerations which lead to the conclusion that defendant is not liable to the plaintiff for this injury. The companion, Tom Jennings, testified that he was walking right by him and did not feel the force of the wind in the least. The improbability that plaintiff was sucked under the cars is by itself very great, when viewed in the light of his own testimony, and is really contrary to the physical law; but when we examine the other evidence it becomes conclusive that no such thing happened, and that he was injured by his own act.

In *L. & N. R. R. v. Lawson,* 161 Ky., 39 (170 S. W., 198), the Court held: A railroad company owed to a licensee walking near its tracks, and who knew of the approach of a train, no duty to slacken its speed of 25 or 30 miles an hour in order to prevent him from being sucked under the train, since, conceding the possibility of its occurrence, it is so remote that ordinary care does not require a railroad company to anticipate or guard against it. It was said in the opinion: "The danger of striking a trespasser is infinitely greater than the danger of injuring a licensee by suction. Trespassers are frequently killed. The number of persons actually sucked under trains, even if such cases ever occur, is so infinitesimally small it would certainly be unreasonable to require railroad companies to reduce the speed of their trains for the purpose of avoiding such accidents. If there be any danger from suction, certainly a licensee, who knows of the approach of a train and has a reasonable opportunity to do so, must get away from the track a sufficient distance to avoid being injured in that way. In our opinion, the trial court erred in not directing a verdict in favor of defendant." The same principle was declared in *Graney v. St. L. I. M. & S. R. R.,* 157 Mo., 666 (57 S. W., 276).

This Court, in *Markham v. R. R.,* 119 N. C., 715, held: An engineer seeing a person walking on or near the railroad track, and having no reason to know or believe that he is disabled in any way from seeing, hearing, and understanding the situation, is allowed to presume that the person is sane and prudent and will either remain upon the sidetrack, where he is safe, or will leave the roadbed proper upon the approach of the train. And we held in *Matthews v. R. R.,* 117 N. C., 640, that an engineer approaching a person who is walking on a footpath near the end of the cross-ties in the same direction as the train is moving has the right to assume that he will remain where he is, if a safe place, or will step farther away from the track if it is dangerous, and that the latter's own want of care must be considered the legal cause of his injury. And in *Royster v. R. R.,* 147 N. C., 347, 350, it was held that the rapid speed of the train, even if an unusual one, can make no difference, if the injured party knew, or could by looking and listening or

otherwise by the exercise of due care on his part have known that the train was coming toward him, citing *Pepper v. R. R.,* 105 Cal., 389; *Kelly v. R. R.,* 78 Mo., 138; and to the same effect are *Meredith v. R. R., supra,* and *Norwood v. R. R., supra,* which held that the trespasser or licensee must keep a sharp lookout for his own protection, and if he fails to do so, and is hurt, the fault is all his.

The cases cited by the plaintiff will be found, on examination, to be quite distinguishable from this case, as the facts were radically different, and they were decided upon the application of a principle altogether different. It may be remarked, though, that the cases generally agree that suction does not, at least usually, occur at the sides of the train, but only at the rear, and for obvious reasons.

That the train was running on Sunday makes no difference, even if it was violating the local law in that respect. The Court said in *P. W. S. R. R. Co. v. P. and H. Towboat Co.,* 23 Howard (64 U. S.), 209, 218: "The law relating to the observance of Sunday defines a duty of a citizen to the State, and to the State only. For a breach of this duty he is liable to the fine or penalty imposed by the statute, and nothing more. Courts of justice have no power to add to this penalty the loss of a ship by the tortious conduct of another, against whom the owner has committed no offense. It is true that in England, after the statute 29 Ch. II., forbidding labor on the Lord's day, they have, by a course of decisions perhaps too obsequiously followed in this country, undertaken to àdd to the penalty by declaring void contracts made on that day; but this was only in case of executory contracts which the courts were invoked to execute. It is also true that cases may be found in the State of Massachusetts (see 10 Met., 363, and 4 Cush., 322) which, on a superficial view, might seem to favor this doctrine of set-off in cases of tort. But those decisions depend on the peculiar legislation and customs of that State more than on any general principles of justice or law. See the case of *Woodman v. Hubbard,* 5 Fost., 67. We would refer, also, to a case very similar in its circumstances to the present, in the Supreme Court of Pennsylvania, in which this subject is very fully examined by the learned *Chief· Justice* of that Court; and we concur in his conclusion: 'We should work a confusion of relations, and lend a very doubtful assistance to morality, if we should allow one offender against the law, to the injury of another, to set off against the plaintiff that he, too, is a public offender. See *Mohney v. Cook,* 26 Pa., 342.' We do not feel justified, therefore, on any principles of justice, equity, or of public policy, in inflicting an additional penalty of $7,000 on the libellants, by way of set-off, because their servants may have been subject to a penalty of twenty shillings each for breach of the statute."

Another reason why the fact of its being Sunday should have no effect on the result is that it was not the proximate cause of the injury, which might just as well have followed if it had been on a Monday.

The case is to be decided, not by the sacredness of the day on which the accident occurred, but by the management of the train and the conduct of the plaintiff; and to this may be added the fact, which constitutes a third reason, that it was an interstate train not subject to the local statute. As was observed by Mr. Webster in the argument of *Gibbons v. Ogden,* 9 Wheaton, 17: "The State may legislate, it is said, whenever Congress has not made a plenary exercise of its power. But who is to judge whether Congress has made this plenary exercise of power? It has done all that it deemed wise; and are the States to do whatever Congress has left undone? Congress makes such rules as in its judgment the case requires, and those rules, whatever they are, constitute the system. All useful regulations do not consist in restraint; and that which Congress sees fit to leave free is a part of the regulation as much as the rest." The same view was adopted in *Re Rahrer,* 140 U. S., 545, where the Court said: "The power of Congress to regulate commerce among the several States when the subjects of that power are national in their nature is also exclusive. The Constitution does not provide that interstate commerce shall be free, but, by the grant of this exclusive power to regulate it, it was left free except as Congress might impose restraint. Therefore it has been determined that the failure of Congress to exercise this exclusive power in any case is an expression of its will that the subject shall be free from restrictions or impositions upon it by the several States." However it may formerly have been, Congress has recently so fully occupied the entire field of interstate commerce as to forbid any action by the State which tends to regulate, control, or restrict it. It was held in *Leisy v. Hardon,* 135 U. S., 100, that commerce between the States has been confided exclusively to Congress by the Federal Constitution, and is not within the influence or control of the State, in the exercise of its police power, unless made so by congressional action. Where Congress is silent or has merely failed to act upon any special subject, it is equivalent to a declaration on its part that in the particular case commerce shall be free and untrammelled. *Bridge Co. v. Kentucky,* 154 U. S., 204.

There is no question in this case as to the violation of any city ordinance in regard to the speed of trains or of any other law on that subject. The Raleigh ordinance regulating the speed of trains within the city limits was not passed until 1912, whereas the plaintiff was injured in 1910. The original theory upon which this case was brought, judging by the complaint, was that the train was running at a speed exceeding 6 miles an hour, which was the limit fixed by the city ordinance, but it turned out, contrary to this theory, that there was no such ordinance

at the time of the accident. There are also other discrepancies between the allegations and the proof.

Plaintiff testified that he could not tell how fast the train was running. The engine was standing at the tank taking water, and was 200 feet from the bridge, and the accident occurred 285 feet beyond the bridge, making 485 feet traversed by the engine before plaintiff was injured. It was a heavy grade from the tank to this place and beyond. Plaintiff's witness, Phillips, said the train was running at a speed of 6 or 8 miles as it passed under the bridge, and consisted of 2 engines and 46 cars. It would be hard to believe that such a train, proceeding up a considerable grade, and round a curve, could acquire the momentum of speed described, 25 miles per hour. Our knowledge of natural and physical laws contradicts any such claim. The train had hardly gone a distance equal to one-third of its own length before the accident occurred. But according to Phillips, it had only acquired a speed of 6 or 8 miles an hour when it passed under the bridge, a little less than half of the whole distance. "Uncontroverted evidence produced to establish a fact does not preclude the court from finding the fact to be otherwise by resort to judicial knowledge." 16 Cyc., 850, 852, 863, 864, and 873. "We may take notice of matters and facts that may be regarded as forming part of the common knowledge of every person of ordinary understanding and intelligence." 16 Cyc., 852. *Russ v. Boston,* 157 Mass., 60. We are not bound to believe that has been done which is impossible according to the ordinary laws of nature; and this judicial notice extends to distance and speed and their relation to each other (16 Cyc., 863, 873), where the question is so presented as to require but the exercise of a little common sense, which even judges are supposed to possess, to determine how the fact is.

It must be remembered, too, that Jennings said that he did not feel any force of the wind as the train passed by them, and he was almost touching the plaintiff as they walked along the Seaboard track together, and plaintiff said the force of the wind pushed him out, not in, and knocked him down; he scrambled to get away, and his leg was cut off. The utter improbability that he was sucked under the cars is shown by this story when compared with the other evidence, and our common knowledge that such is not the case at that part of a train, there being nothing to create a vacuum and cause an inrush of air, so as to create suction towards the car. The force of the air would be outward—centrifugal, rather than centripetal—and this is what knocked him down, if it be true that he fell and lost his leg in that way. It is more reasonable to conclude, as did the learned judge, even against the verdict of the jury, that the plaintiff's theory was incredible and that he was doing more than merely walking quietly with Jennings along the Seaboard track, and there was strong evidence that the train was only starting

and that he was trying to get on the car, or grabbing at it with other boys, sportively but recklessly.

We have dealt with the case as if the plaintiff was on the defendant's right of way; but it is stronger for the defendant, as he was on the Seaboard track, apparently out of danger, and no engineer could reasonably have foreseen the occurrence of such an accident, even if we assume that it could possibly have happened by suction.

The cases of *Graney v. R. R.,* 157 Mo., 666, and *R. R. v. Lawson,* 161 Ky., 39, which were cited to us by defendant's counsel, are precisely applicable, as they hold that if injury by suction is possible, it is so improbable as not to be in law among those events which can be foreseen, and, as matter of law, that an engineer is not required to anticipate its occurrence and slacken the speed of the train on that account. The other case cited for plaintiff, *Munroe v. R. R.,* 85 N. J. L., 688, presents facts essentially different from those shown in this record, as there the intestate was standing as a passenger on the platform in Elizabeth, N. J., at the place for receiving and discharging passengers and where he had been invited to come and where he had the right to be, and a train from New York whizzed by him at an enormous rate of speed—a mile a minute—and the force of the current of air thus generated knocked him down on the platform and injured him, so that he died. The case is principally valuable here as tending to show that this plaintiff's theory, that he was forced under the train by the sudden rush of the wind, is unreal, or, at least, not substantiated, for the intestate of plaintiff, in that case, was not sucked under the cars, but was pushed along and fell on the platform.

It results that the nonsuit was properly entered, for several reasons:

1. That there was no evidence that defendant was guilty of any negligence which proximately caused the injury to the plaintiff.

2. If the injury occurred in the manner alleged by the plaintiff, it was such an unusual occurrence as not to be one which the engineer could reasonably have expected would be the result of the rapid movement of the train.

3. The plaintiff having equal opportunity with the engineer to see the danger, if there was any, had he exercised ordinary care, and being able to place himself in a position of safety, was himself guilty of such negligence as bars his recovery.

Our conclusion is that, for the reasons above stated, the judgment should be

Affirmed.

ALLEN, J. I concur in the opinion sustaining the judgment of nonsuit.

An examination of the complaint makes it clear that the action was

commenced upon the theory that the defendant was negligent in that it had violated an ordinance of the city of Raleigh regulating the speed of trains; but this ground of negligence had to be abandoned because there was no such ordinance in existence at the time the plaintiff was injured.

The plaintiff then undertook to prove that at the time of his injury he was walking in a cut 30 feet deep, on the track of the Seaboard Railroad, about 5 feet from the track of the defendant; that this track was used generally by the public; that the rate of speed of trains passing this point was usually 10 miles an hour; that the train which injured him was running 25 or 30 miles an hour, that he relied on the custom as to the speed of the train, and as the train was passing he was carried by suction under the train and injured.

I recognize the rule that it is for the jury, and not for this Court, to pass on the weight of evidence and the credibility of witnesses, but the two facts upon which this position rests: (1) that the train was running 25 or 30 miles an hour, (2) that the plaintiff was carried under the train by suction, are not only not established, except as they may be said to be included in the verdict, but the circumstances show they could not have existed.

The defendant's train was a freight carrying forty-six loaded cars. It was at a standstill at the water tank 485 feet from the place of the injury, and it was running partly on a curve and up a heavy grade.

One witness, a young man about 20 years of age, the companion of the plaintiff, who had not noticed the speed of the train as it was approaching, and had to reach his conclusion in a moment of time, testified that the train was running 25 or 30 miles an hour; but the circumstances as to the length and weight of the train, the curve, the grade, and the distance traversed—circumstances that are not disputed—would seem to make it impossible for the train to have attained this speed.

No witness testified that the plaintiff was carried under the train by suction.

The plaintiff testified that as the train passed "It seemed like a force of wind pushed me like that and knocked me down," and he told his brother he did not know how it happened or how he got under the train.

His companion at the time of his injury, who was walking by his side, testified that he did not feel the force of the wind as the train passed.

There was no evidence that in the history of railroading any person had been injured by the force of wind while standing 5 feet from a passing train running 25 or 30 miles an hour, and no evidence that any such injury could have been anticipated or foreseen.

It was, however, for the jury to determine the weight of the evidence, and we are confined to the single inquiry as to whether there is evi-

dence of negligence, and this involves the question as to whether there has been a breach of duty on the part of the defendant.

I do not think that acceleration of the speed of the train, if established, is negligence, and as there is no evidence that the injury to the plaintiff could have been anticipated by the exercise of ordinary care, the judgment of nonsuit was properly entered.

This Court said in *Carter v. Lumber Co.,* 129 N. C., 209, which has been frequently approved: "No act or omission, though resulting in damage, can be deemed actionable negligence unless the one responsible could, by the exercise of ordinary care under all the circumstances, have foreseen that it might result in damage to some one. A. and E. Enc. of Law, vol. 16, p. 439; Pollock on Torts, 36, 37; Shear. and Redf. on Neg., 10. There must be, before a recovery can be had in actions for negligence, a breach of duty on the part of the defendant, and the act or omission producing the breach of duty, culpable in itself, must be such as a reasonably careful man would foresee might be productive of injury; and one is not liable for an injury which he could not foresee. Smith on Neg., 24; *Blythe v. Water Co.,* 11 Exch., 781"; and in *Ramsbottom v. R. R.,* 138 N. C., 41, which has been approved fourteen times: "To establish actionable negligence, the question of contributory negligence being out of the case, the plaintiff is required to show by the greater weight of the testimony, first, that there has been a failure to exercise proper care in the performance of some legal duty which the defendant owed the plaintiffs under the circumstances in which they were placed, proper care being that degree of care which a prudent man should use under like circumstances and charged with like duty; and, second, that such negligent breach of duty was the proximate cause of the injury—a cause that produced the result in continuous sequence and without which it would not have occurred, and one from which any man of ordinary prudence could have foreseen that such a result was probable under all the facts as they existed."

The evidence for the plaintiff brings the case within the accepted definition of an accident, which is "An event from an unknown cause or an unusual and unexpected event from a known cause." *Crutchfield v. R. R.,* 76 N. C., 320; *Raiford v. R. R.,* 130 N. C., 597; *Overcash v. R. R.,* 144 N. C., 579; 1 Corpus Juris, 390.

CLARK, C. J., dissenting: The plaintiff, a boy nearly 14 years old at the time, had his foot cut off by a freight train on Sunday, 17 July, 1910. The train, according to defendant's evidence, consisted of forty-five sealed box cars and a "shanty" car, and was a "double-header," *i. e.,* it had two engines in front. The extra engine was in use because the defendant had too much "power" in Selma, and wanted the extra engine in Spencer.

The injury occurred shortly after noon, in the cut 285 feet west of Boylan Bridge in the city of Raleigh and in the yard limits of the defendant. At that point there are two tracks running parallel, one belonging to the Seaboard Air Line, on which the plaintiff and a friend were walking, going west, and the defendant's train on its own track came up behind, going in the same direction. The evidence on both sides was that these tracks and the space between had been greatly and constantly used by the public, and more used by pedestrians on Sunday than on any other day. There was some conflict of evidence whether there was any notice posted against the use of the tracks, or the space between them, by the public, but it was uncontradicted that, if so, no attention had been paid, and that the defendant had never undertaken to enforce such warning.

The plaintiff and a companion were going west on the Seaboard track in said cut. The end of the Seaboard ties are 5 feet 4 inches from the end of the defendant's ties and the inside rails of the two roads 8 feet 4 inches apart. The evidence for the plaintiff is that he was walking on the end of the Seaboard ties nearest to the defendant's train; that he was 5 feet or more from the cars of said train as it passed; that his companion said to him that the train was coming up on the other track from behind; that the usual rate of speed at that point within the yard and city limits did not exceed 8 or 10 miles an hour, and that at such speed he was in no danger, and, expecting the usual speed, he did not turn around until just as the train shot by him at a speed of 25 or 30 miles an hour; that such was the impetus of the air caused by two engines and a long train at that speed that he was knocked down, and by the suction was drawn under the cars and his leg cut off above the ankle.

The defendant's evidence was that its train was not running at the time more than 6 or 8 miles an hour, and there was evidence tending to show, as the defendant contended, that the plaintiff attempted to swing up on one of the cars as it passed and, falling, lost his foot under the wheel, which passed over it. The defendant's conductor testified that the train was running from Selma to Spencer and had run the 27 miles from Selma to Raleigh in 55 minutes, but that at the time of the injury to the plaintiff the train was running about 8 miles an hour; and further, that even if it had been running at the high speed claimed by the plaintiff, there was no suction which would have drawn him under the train.

The court charged, among other things, that the only duty of the defendant was to run its train with ordinary care and in conformity to the established custom—customary speed. If it did that, it could not be liable in any aspect of this case, and the jury would answer the issue of negligence "No."

But that if the defendant did not do this, and the jury should find the other contentions of the plaintiff to be true (that is, that the great speed at which the train was moving caused the windage to knock the plaintiff down and the suction threw him under the cars), and that the defendant's conduct on that occasion was the proximate cause of the injury, to answer the issue of defendant's negligence "Yes." That if the jury found that the proximate cause of the injury was the plaintiff attempting to board the moving train, to find the defendant guilty of contributory negligence.

Upon the evidence and arguments presented and the charge of the court the jury found the defendant guilty of negligence which was the proximate cause of the injury, that the plaintiff was not guilty of contributory negligence, and assessed the damages which the plaintiff should recover.

The plaintiff tendered the court a judgment in accordance with the verdict. The defendant moved the court to set aside the verdict and to enter a judgment of nonsuit. The court set aside the verdict as a matter of law and entered a nonsuit against the plaintiff.

If the court had set aside the verdict as a matter of discretion, it would have been irreviewable, but it could not then have entered a nonsuit. Revisal, 539; *Riley v. Stone,* 169 N. C., 421. The court, however, set aside the verdict as a matter of law; that is, he adjudged that the facts alleged in the complaint and proven (as the jury found) did not constitute a cause of action, and that the charge was erroneous that such facts, if found, made defendant guilty of negligence. If this was correct, the nonsuit was properly entered.

There was evidence upon the issues, and the finding of the jury thereon is conclusive as to those facts. The only question is whether the facts alleged in the complaint and found to be true by the jury justified, as a matter of law, judgment in favor of the plaintiff.

There was evidence that the defendant was rushing its train with two engines at a high rate of speed within city limits and along and parallel to the track of the Seaboard road where people were accustomed to walk and where the engineer must have seen the plaintiff with his companion walking. There was evidence not only that such high rate of speed would knock a man down, but that it did knock the plaintiff down, who must have been more than 5 feet distant from the defendant's train, and who was in no danger of being thus injured if the train had been running at the ordinary rate of speed in town limits, of some 8 or 10 miles an hour; and that being thus knocked down, the suction from such a train moving at such high speed could, and in fact did, roll the plaintiff under the car wheel, causing him to lose his leg.

There was no evidence which satisfied the jury that the plaintiff was guilty of contributory negligence in walking along the parallel track of

the Seaboard Railroad on that occasion, and the burden was on the defendant to prove this. Revisal, 483.

The defendant insists that it was contrary to physical law that the plaintiff could have been knocked down by the rush of air caused by the train, or that the suction could have rolled him under the cars. But that was a matter of fact for the jury to determine. The evidence was conflicting, and the jury found that the fact was as contended by the plaintiff. We do not feel called upon to distinguish the cases of *Graney v. R. R.,* 157 Mo., 666, and *R. R. v. Lawson,* 161 Ky., 39, though we think that they went off upon the question of contributory negligence, because the ruling of those courts as a matter of law cannot control the finding of fact by the jury. "We cannot argue against a fact."

The plaintiff relies upon *Munroe v. R. R.,* 85 N. J., 688, which set aside the nonsuit in a case where the deceased was standing on a depot platform, 3 feet from its edge, when a through express train ran by at 60 miles an hour, creating a current of air which threw him down and killed him. That Court was of the opinion that although the express train was going at its customary rate of speed, its failure to give reasonable signal of approach to the depot was sufficient evidence of negligence to go to the jury. In *Trieber v. R. R.,* 134 N. Y. App. Div., 661, the Court set aside a nonsuit where the decedent, 6 feet off, was swept under the car by suction, and killed.

In this case the plaintiff was not on the defendant's track nor in an obviously dangerous position. The jury found that he was not guilty of contributory negligence, but that the proximate cause of the injury was the negligence of the defendant in rushing this train at 25 or 30 miles an hour by the plaintiff when the usual speed of trains at that place, where the public were accustomed to walk, was from 6 to 10 miles an hour.

It is a novelty in the law of this State to suggest that this Court can take our own estimate of the weight of the evidence as against the finding of the jury. The well recognized maxim of English law is, "To issues of law the court responds, but to issues of fact, the jury." If the jury find contrary to the weight of the evidence, the presiding judge has the authority to set aside the verdict on that ground. This he has refused to do, showing that he thought the verdict was not in violation of the evidence. This Court has always refused to assume jurisdiction to review the action of the judge in such case. It cannot be necessary to cite the numerous authorities to this effect, for it is an elementary principle of our law and dangerous to disturb.

The expression of the plaintiff, that he was "pushed out," shows that he was speaking of being pushed out from the track on which he was walking, for he said that he was sucked under the train on the other track. This is the natural law in such cases.

DAVIS *v.* R. R.

We know that when by the passage of a rapidly moving body a vacuum is created, the air rushes in to fill the vacuum. Here, if, as the witness testified and the jury found to be the fact, the train was moving at great speed, it drove aside the air in front of it and the vacuum thus created was necessarily filled by the inrush of the air from the sides, as can be seen in any rapidly moving train picking up chips and paper and small articles at any time. The inrush of the air is often terrific.

We know that the terrible tornadoes and hurricanes which destroy forests and cities and shipping and oftentimes cause great loss of life are caused by the tropical sun rarefying the air which rises, leaving a semi-vacuum into which the air rushes from long distances. At the battle of Sharpsburg (or Antietam) the writer of this opinion was in the act of speaking to General Armistead (who afterwards found a soldier's death at Gettysburg), who, drawn sword in hand and on foot, was leading his brigade into action, when a huge shell passing at that instant just to the other side of the General, he plunged forward, his sword flying one way and his hat the other. His staff officers, thinking both legs had been shot off at the knees, sprang forward to raise him up, when they found that he was uninjured and without a scratch even, except where his face had struck the ground. The force of the air rushing in to fill the sudden vacuum had knocked him down just as if he had been felled by a blow from a heavy stick on the back of his head.

The evidence of the witness is in accordance with the well known action of air in such cases, and can be found illustrated in any work on physics under the head of "Ballistics." The air was split open by the head of the engine, leaving a vacuum along the track into which the air rushed, pushing the plaintiff under the train, if his evidence is to be believed, which was a matter solely for the jury, not for us. Water is somewhat denser than air, but any boy who has thrown a large stone into a shallow millpond knows that, in like manner, it will create a vacuum, laying bare the bottom of the pond, which the water rushes in to fill.

It will be a dangerous innovation if the courts on appeal begin to take their own estimate of what a jury should believe or should not believe, instead of accepting their verdict as the lawful triers of the fact, as final, when the trial judge refuses to disturb it.

Though modern research has demonstrated that we do not owe trial by jury to Magna Carta, and that it originated years after, still for long centuries it has been the great bulwark of right in Anglo-Saxon law that every citizen, however humble, could have the facts in controversy found by a jury of his peers. The plaintiff in this contest with the defendant was entitled, like all others, to have the disputed fact, the vital fact, the material fact, whether or not he was swept under the train and injured, as he alleges, by the suction caused by the negligence

of the defendant in running its train at an excessive speed in close proximity to the plaintiff, decided by a jury of his peers, and to have the historic Twelve, "The Great Twelve," stand between him and the defendant. A disputed matter of fact is no more in the province of this Court to determine than it is in the province of the trial judge.

It was also in evidence by defendant's witnesses that the train was running from Selma to Spencer on Sunday, carrying forty-five cars of freight, and that there was no live stock or fruit or other perishable freight. Under Revisal, 3844, the defendant was indictable and subject to a fine of not less than $500. There was no evidence which withdrew the defendant from liability for misdemeanor under said section, or under Revisal, 2613, and under the amendment thereto, Laws 1909, ch. 285. It is true that the defendant's conductor testified that the cars had come from Pinner's Point, Va.; but this train had been made up at Selma, and he said that some of the cars were going beyond Spencer. This matter was considered in S. v. R. R., 119 N. C., 814, and it was held that the act was constitutional, and not an interference with interstate commerce, cited since in S. v. R. R., 149 N. C., 470. It is true that in an indictment under this statute a new trial was granted below in S. v. Ry., 145 N. C., 570, but it was for the use of the expression, "If the jury find from the evidence," which has been repeatedly held since not reversible error. Walker, J., in Holt v. Wellons, 163 N. C., 131, and cases there cited. If the defendant was running in violation of the statute it was guilty of negligence, as a matter of law, as has often been held. However, this point was not pressed below, and there was no ruling upon it and no exception upon that ground.

The judgment setting aside the verdict and entry of a nonsuit ought to be reversed and the case remanded to the lower court, that judgment might be imposed upon the verdict according to law. Wood v. R. R., 131 N. C., 48; Shives v. Cotton Mills, 151 N. C., 294; Ferrall v. Ferrall, 153 N. C., 179. The defendant will then be entitled to enter its appeal and have the statement of the case made up on appeal setting out the exceptions, if any, which it caused to be entered by the judge during the trial, Revisal, 536, 591, and its assignments of error, should it choose to appeal.

It will be noted that more than five years have elapsed since this injury occurred. There is no indication that either party is in any wise to blame for this delay. But the frequency with which cases come to this Court, after similar or even longer delays, makes it proper, as we have done, to call the matter again to the attention of the lawmaking body. Such delays cause heavy costs to accumulate and witnesses die or their memory becomes indistinct. One of the pledges of Magna Carta was that "justice should not be delayed."

Hoke, J., concurs in dissent of Clark, C. J.