Three civil actions for recovery of damages in the sums of $50,000, $30,000 and $18,000, respectively, allegedly sustained by the respective plaintiffs in a motor vehicle collision as result of actionable negligence of defendant, through its agent and employee.
These actions were begun in Superior Court of Halifax County and, upon motion of defendant, removed to and, after consolidation for purpose of trial, tried in Superior Court of Edgecombe County.
These facts appear to be uncontroverted: At about 8:30 o'clock on the morning of 29 September, 1944, the 1/2 ton Ford pick-up truck of plaintiff R. H. Wallace, operated by him in a northerly direction on U.S. Highway #301 between Enfield and Halifax, North Carolina, and in which plaintiffs W. B. Rivenbark and Clyde G. House were riding, and a large 1941 Mack truck and trailer owned by defendant F. B. Longest, trading as Longest Lumber Company, and operated by Prince Wiggins, agent and employee of said defendant in the scope and course of his employment, and traveling on said highway in a southerly direction toward Enfield, North Carolina, came into collision at a point on said highway about 5 1/2 miles north of Enfield and near or within the vicinity of the residence of one J. J. Collie. And the several plaintiffs sustained personal injuries as a result of such collision.
Plaintiffs in their respective complaints allege, in substantial accord, that at the time of the collision R. H. Wallace was driving his said Ford truck in a careful and prudent manner in full compliance with the traffic laws of the State of North Carolina on his right-hand side of the paved highway; that as the Ford truck and defendant's Mack truck with trailer approached each other, when said trucks were approximately sixty feet distant from each other, driving in opposite directions, the *Page 163 
defendant's agent Prince Wiggins "in violation of the laws of the State of North Carolina and in complete disregard of the safety of others and particularly of this plaintiff, without regard for existing traffic and without warning, suddenly drove said huge Mack truck and trailer sharply over and upon his left-hand side of said paved highway and in the left lane of said highway in front of the approaching Ford truck operated by" Wallace; that plaintiff, Wallace, "confronted by the sudden emergency caused by the aforesaid unlawful and negligent action of the defendant's agent or employee, . . . attempted to drive said Ford truck out of the path of defendant's huge Mack truck and trailer by driving said Ford truck as far off the paved portion of the highway and onto the dirt shoulder to his right as possible, — there being at said place a deep ditch to the right of the shoulder of said highway"; that although plaintiff Wallace "made every effort to avoid a head-on collision as aforesaid, the defendant's said agent or employee unlawfully, negligently, recklessly and carelessly, in complete disregard of the safety of this plaintiff, continued to drive said huge lumber truck with trailer on the wrong side and in the left lane of said paved highway in violation of the laws of this State, in front of the vehicle operated by plaintiff" Wallace "and against the same, then and there striking and colliding with the vehicle operated by plaintiff, completely demolishing said Ford truck and severely, painfully and permanently injuring the plaintiff, etc."; and "that the carelessness and negligence of the defendant's said agent or employee in operating said Mack lumber truck and trailer in the aforesaid unlawful manner, on the wrong half of the public highway under such circumstances as aforesaid, without regard for the existing traffic going in the opposite direction, was the sole proximate cause of the collision herein complained of and all of the aforesaid injuries and damages to this plaintiff."
Defendant, answering, denies the above allegations of the several complaints in material aspects, and sets forth his version of how the collision took place — through no fault of his driver, Prince Wiggins, but solely as proximate result of the sudden emergency created by unexpected and unlawful act of plaintiff Wallace when at a point some 15 or 20 feet or some short distance in front of defendant's truck, and when running at speed of 40 miles per hour, in suddenly turning his Ford truck from his right side of the highway to the left, that is in a westerly direction, across the road, and colliding on the right front side of said Ford truck, with the left front end of defendant's Mack truck.
And, defendant, answering complaint of plaintiff Wallace, pleads his negligence as a contributing cause of his injury in bar of his recovery.
The statement of case on appeal to which attorneys for plaintiff and for defendant agreed shows the following: "After the pleadings were *Page 164 
read and before any evidence was introduced, the parties stipulated in open court, `that the photographs marked 1 plaintiff, 2 plaintiff, 3 plaintiff, . . . are authentic photographs of the location of the accident, looking north . . . And it is further stipulated, and this stipulation is not to be considered an introduction of evidence by the defendant at this time, that the photographs marked 1 defendant, 2 defendant and 3 defendant, are authentic photographs of the Mack truck belonging to F. B. Longest involved in the accident; and that the photographs marked 4 defendant, 5 defendant and 6 defendant, are authentic photographs of the Ford pick-up truck involved in the accident, — these photographs being taken on the 14th of October, 1944, and that the pictures of the Mack truck do not include the Kingham trailer described in the complaint.'"
But it is noted here that while the photographs marked 1 plaintiff, 2 plaintiff and 3 plaintiff were referred to by plaintiff's witnesses in connection with and in illustration of their testimony, the record fails to show that they were offered in evidence.
And, furthermore, while the photographs marked 1 defendant, 2 defendant and 3 defendant were identified by one witness, as a fair representation of defendant's truck after the accident, and while the photographs marked 4 defendant, 5 defendant and 6 defendant were identified by the same witness, as a fair representation of the Wallace pick-up truck after the accident, the record fails to show any oral testimony as to the condition of the trucks after the collision, which these six photographs might have illustrated, and the record fails to show that any of these photographs were offered in evidence.
Plaintiff offered evidence tending to show this narrative of pertinent facts surrounding and pertaining to the accident: The highway at the point of collision runs about north and south. At that point there is a curve described as one "you can safely make at 60 miles an hour." The highway has a concrete surface 17 1/2 or 18 feet in width, with black marked center line. From the north toward the point of collision there is "just a little bit of downgrade." Traveling north and approaching the point of collision, there is on the right, or east side, of the highway, a ditch running parallel with, and probably 8 or 9 feet from the hard surface. The depth of this ditch is variously estimated to be from 2 1/2 to 4 feet. The width of it may be 2 1/2 to 3 feet. The shoulder of the road between the hard surface and this parallel ditch is fairly level. "It tapered off down to the ditch." This parallel ditch connected with a deeper ditch which ran west into a culvert underneath the highway. There was no bridge over the latter ditch. It was open to a point about 6 or 6 1/2 feet from the hard surface. It was 4 1/2 or 5 feet deep, and 5 or 6 feet wide close to the top "and comes down kinder small at *Page 165 
bottom." "It looked more like a hole than a ditch." The collision occurred just beyond this cross ditch, that is, north of it. The Ford pick-up truck of plaintiff Wallace was of 1/2 ton capacity. It was carrying tools, solder, tin, a container of cement, etc., all of which weighed not over 200 or 300 pounds. Defendant's truck, compared with the pick-up truck, was much larger and heavier. It consisted of a truck or tractor, so interchangeably designated, of short wheel base, between 10 and 12 feet long, and a trailer about 21 feet long, an overall length of between 30 and 35 feet. The tractor had two sets of wheels. The trailer had a set of dual wheels underneath the rear, and it was connected with the tractor by "a fifth wheel." There were no other wheels under the trailer. The pick-up truck in which plaintiffs were riding was headed north, and defendant's truck south.
Plaintiff R. H. Wallace testified in pertinent part: ". . . I live at . . . Rocky Mount, North Carolina . . . I have a roofing and sheet metal business in Weldon. Bernice Rivenbark and Clyde House work for me . . . On the morning of September 29, 1944, I drove a Ford pick-up truck intending to go from Rocky Mount to my shop in Weldon. Mr. House was seated next to me and Mr. Rivenbark on the outside. I was taking them to work. While we were between Enfield and Halifax, about 50 or 60 feet from me, I would say, I saw a truck coming down the road, about at that distance his front wheel came over the center line, over to my side of the road, and that is when it first registered in my mind, though I might have seen the truck further down the road, but it registered in my mind then, and I got over on my side of the road more and as he got nearer me, his entire truck was over on my side of the highway. I commenced closing up and leaving the highway on my right and I got off the highway as far as I could to keep from running into a ditch which was running parallel with the highway. We both went together, the two radiators, and when we actually hit we went up kind of like that (indicating), the radiators went up like that and what happened from then on I don't know. But as the truck was approaching me the driver of the other truck was in a slumped position like this (indicating). He was in a stooped position like this (indicating); you could see his hands on the wheel, or down in position, wouldn't say they were on the wheel, but saw the wheel. I noticed him stooped over the steering wheel about 50 or 60 feet away, I judge . . . I commenced slowing up and pulled off the highway . . . At the time I first saw the truck approaching me I was driving between 30 and 35 miles an hour; . . . the ditch which goes underneath the hard surface was what I was trying to keep from getting into. . . . The last time I saw that truck the entire truck was on my side of the road. Part of the wheels of the back part of the trailer were on his side of the center line, but the entire *Page 166 
truck was on my side. By that truck, I mean the front part of the oncoming truck that the trailer was attached to. In other words, four wheels were on my side of the hard surface and the trailer part to the truck, the last two wheels were on, that's all. I think I was all four wheels off the paved surface. To avoid the collision I was doing my best to get in the field there but this ditch kept me from going further that way and by that time the accident had already occurred. . . . I got up just beyond this ditch that is going across the highway (indicating). All I remember is that it was just past this ditch that comes across the highway where the accident occurred . . . When I saw that truck coming around the curve here (indicating on photograph) it was somewhere close to 50 to 60 feet away. It is hard to judge on an oncoming vehicle, a car or truck, but there was time enough to take me clear off the hard surface. There was no bridge over it and my truck didn't quite cross it. In other words the ditch doesn't come into the highway. It lacks about 6 feet; you just have room between the highway and the ditch."
Mrs. J. J. Collie testified that she was in her garden on the east side of the highway at the time of the collision; that she saw the Wallace pick-up truck going toward Halifax; that she noticed this truck "leaning to the right coming off the highway, coming very slow . . . not going a bit over 30 miles an hour . . . start driving off the side of the main hard surface of the highway . . . for 150 or 200 feet"; that she heard the crash and looking up "the two radiators had already hit, you might say they were parting from each other. They contacted on the right side of the road — Mr. Wallace's right, the side I was on."
Plaintiffs further offered evidence tending to show: (1) That in the collision the pick-up truck "was knocked around" and came to rest on the east side of the highway headed south with front wheels in the ditch that runs into the culvert underneath the hard surface of the highway, and the engine hanging over it; that there was one track of automobile which came off the hard surface on to the dirt shoulder on the east side of the highway about 150 feet before the ditch that goes into the culvert is reached, and extended about two feet off the hard surface up to the point where the pick-up truck came to rest; (2) that after the collision the rear end of the trailer was about 2 1/2 feet over on the east side of the marked black center line of the highway; and the rear wheels of the truck or tractor were on the shoulder on the west side of the highway and the front of the truck or tractor was up the bank of that side headed out into a field, but the front wheels had been torn away, and were out in the field 8 or 10 feet; (3) that after the collision (a) plaintiff Wallace was "jammed right under the wheel" and had to be pulled away, and was unconscious; (b) plaintiff Rivenbark was "under the front end of the trailer up under the edge of the bank, all mashed in the dirt" on the *Page 167 
west side of the highway, and (c) plaintiff House was also on the west side of the highway, lying straight up and down the ditch, about 8 or 10 feet from Rivenbark; and (4) that the tools, etc., which were in the pick-up truck were scattered all over the highway.
Plaintiff's evidence further tends to show that, before and at the time of the accident, the weather was misty and foggy; that "you could actually see, — could see the highway very plainly"; and that it rained in eight or ten minutes afterwards.
The evidence further tends to show that plaintiff Rivenbark regained consciousness about eight weeks after the accident and has no recollection of anything that happened on the day it occurred; that plaintiff House regained consciousness two or three days after the accident, but says he did not see the collision and thinks he was asleep, having been up late the previous night; and that each of the plaintiffs sustained serious and permanent injury.
Defendant offered no evidence, and preserved his exception to refusal of the court to grant his motions for judgments as in case of nonsuit.
The cases were submitted to the jury in each action upon two issues, first, as to negligence of defendant, as alleged in the complaint, and, second, as to damages. The jury answered the first issue Yes, and awarded as damages $15,000 to plaintiff Wallace, $18,000 to plaintiff Rivenbark, and $8,000 to plaintiff House. From judgments for the respective plaintiffs in accordance with the verdict, defendant appeals to Supreme Court and assigns error.
The sole question presented for decision on this appeal relates to the refusal of the court below to sustain defendant's motions for judgments as in case of nonsuit. The challenge to the propriety of such action by the court, as stated in brief of defendant, is based in the main upon contention that the oral evidence offered by plaintiffs "is manifestly unreasonable and inherently incredible when tested by commonly known physical laws in the light of incontrovertible physical facts." While the principle of law invoked in support of this theory is well established in appropriate instances, Davis v. R. R., 170 N.C. 582, 87 S.E. 745;Powers v. Sternberg, 213 N.C. 41, 195 S.E. 88; Austin v. Overton,222 N.C. 89, 21 S.E.2d 887; Ingram v. Smoky Mountain Stages,225 N.C. 444, 35 S.E.2d 337; Tysinger v. Dairy Products,225 N.C. 717, 36 S.E.2d 246, the evidence in the record *Page 168 
on this appeal does not present a factual situation to which it may be properly applied.
In this connection the only evidence shown in the record, almost entirely oral, is that offered by plaintiffs. The record fails to show that defendant's photographs, identified by stipulation of parties and by oral testimony, were offered in evidence. Therefore, they may not be considered as evidence. Hence, in considering the exceptions to refusal of defendant's motions for judgments as of nonsuit, we have, as above stated, only the evidence offered by plaintiffs. However, defendant concedes that he had the benefit of these photographs before the jury, as if they had been offered in evidence.
The oral evidence tends to show (1) that the driver of defendant's truck in meeting the pick-up truck in which plaintiffs were riding was not passing on his right side of the highway, and (2) that he was not giving to the oncoming truck at least one-half of the main traveled portion of the roadway as nearly as possible, in violation of the provisions of the statute relating to meeting of vehicles. G.S., 20-148. A violation of this statute would be negligence per se. Hobbs v. Coach Co., 225 N.C. 323,34 S.E.2d 211; Tarrant v. Bottling Co., 221 N.C. 390,20 S.E.2d 565. If such violation of this statute were the proximate cause of the injury it would be actionable. Whether it were the proximate cause is a matter for consideration of the jury under the law as declared by the court.
But if there were evidence tending to support the theory of the defendant as shown in his answer, that is, that in colliding the right front side of the Ford truck came in contact with the left front end of defendant's truck as defendant contends his photographs show, still the question as to whether defendant's truck was on its left side of the highway and, if so, whether that were the proximate cause of the collision would be for the jury.
Careful consideration of the question presented, on the record before us, fails to disclose error in the trial court submitting the case to the jury. No exception is taken to the charge. Hence, the case was largely one of fact for the jury, and the jury has spoken.
We find
No error. *Page 169